[L. A. No. 13867.   In Bank.—April 26, 1935.]

ALAMITOS LAND COMPANY (a Corporation), Plaintiff and Appellant, v. SHELL OIL COMPANY (a Corporation), Defendant and Appellant.

Orrick, Palmer & Dahlquist, Heller, Ehrman, White & McAuliffe, W. H. Orrick, Leslie R. Hewitt, Mitchell T. Neff, Oliver O. Clark, Raymond J. Kirkpatrick and Sherman Anderson for Plaintiff and Appellant.

Hanna & Morton and Harold C. Morton, as *Amici Curiae* on Behalf of Plaintiff and Appellant.

J. M. Mannon, Jr., F. F. Thomas, Jr., Edwin S. Pillsbury, William E. Wright and McCutchen, Olney, Mannon & Greene for Defendant and Appellant.

Humphrey, Searls, Doyle & MacMillan, William F. Kiessig, Robert M. Searles, Paul M. Gregg, L. W. Andrews, A. V. Andrews, A. L. Weil, Charles C. Stanley, Pillsbury, Madison & Sutro, Felix T. Smith and R. K. Barrows, as *Amici Curiae* on Behalf of Defendant and Appellant.

PRESTON, J.—Plaintiff and defendant, corporations, are respectively the lessor and lessee under an oil and gas lease touching lands in Los Angeles County, a part of the Signal Hill oil field. The lease is dated January 3, 1921, and was amended in certain particulars, respecting the production of gas only, on March 14, 1924. This action by plaintiff is one in equity to impeach as insufficient and fraudulent the accounting made by defendant to plaintiff respecting its one-sixth owner's royalty interest in the oil and gas produced and saved from the demised premises and to secure the confirmation, by decree, of a forfeiture of said lease by reason of said fraudulent accounting thereunder. Issues were framed and a prolonged trial followed, beginning June 23, 1931, and ending October 10th of the same year. A voluminous transcript resulted and the questions discussed cover a wide range. The court made 155

separate findings. The judgment disposes of issues presented in nine numbered paragraphs as follows:

(1) Plaintiff is awarded $486,613.53 and interest on $388,-451.68 at 7 per cent per annum from June 15, 1931, to and including April 20, 1932, amounting to $23,094.22, because of failure of defendant to account and pay to plaintiff its royalty share of oil produced and saved under the lease.

(2) Plaintiff is awarded an additional amount of $4,192.22, together with $328.50 interest thereon, because of charges made by defendant against it for dehydrating or otherwise cleaning plaintiff's royalty oil produced and saved under said lease between and including September 1, 1930, and June 30, 1931.

(3) It is provided that defendant, if reinstated under said lease, shall not be entitled thereafter to charge plaintiff for the cost of dehydrating or otherwise cleaning plaintiff's royalty oil, whether taken in kind or sold to the lessee.

(4) It is provided that defendant, if reinstated under said lease, shall hereafter determine the quantity of oil produced and saved under said lease by testing the oil at the time of its purchase by defendant from plaintiff under said lease, by a test or combination of tests reasonably adapted to the testing of oil, which will accurately determine the amount of water and other foreign substances in the gross fluid produced on the premises under the lease.

(5) It is provided that defendant, if reinstated under said lease, shall account to plaintiff for its royalty oil thereunder and shall pay plaintiff for such royalty oil as defendant shall purchase thereunder, on the basis of the actual gravity of said oil.

(6) It is provided that plaintiff do not have or recover judgment against defendant for any quantity of oil produced and saved under the lease prior to September 1, 1930, and not accounted and paid for by defendant to plaintiff.

(7) It is provided that plaintiff do not have or recover any judgment against defendant on account of any natural gas produced and saved under said lease and removed from said demised premises prior to April 19, 1932.

(8) It is provided that plaintiff have judgment declaring the forfeiture and termination of all right, title, interest and equity of defendant in and to said lease of January 3, 1921, and said contract of March 14, 1924, provided, however, that defendant shall be relieved of such forfeiture in

the event that it pays to plaintiff, on or before August 29, 1932, all sums for which judgment is given herein.

(9) That plaintiff have and recover of defendant its costs and disbursements.

We are confronted with cross-appeals. Defendant has appealed from all those portions of said judgment represented by paragraphs 1, 2, 3, 4, 5, 8 and 9 thereof. Defendant has also appealed from an order denying its motion to vacate the findings and judgment first entered in the case and to reopen it for further evidence and for leave to file an amended and supplemental answer. Plaintiff has appealed from all those portions of the judgment represented by paragraphs 6 and 7 thereof.

The period covered by the accounting in question is from January 1, 1923, to September 1, 1930; also certain phases of an accounting for the period from September 1, 1930, to June 30, 1931, the entire period covering about 8½ years. Oil was discovered on said property in June, 1921, and some 39 wells are now in active production on the premises. The amounts involved are large and the issues are important.

### Defendant's Appeal.

Our study of the cause has brought us to the conclusion that the controlling question presented is that of a proper interpretation of the oil and gas lease in the light of undisputed facts and trade usages. In this connection the following language of the lease is important:

"The Lessee shall deliver to the Lessor on said demised premises, as royalty hereunder, the equal one-sixth (⅙) of all petroleum oil, asphaltum or other hydro-carbon substances produced and saved from said demised premises by said Lessee, and said Lessor shall have the option to take its royalty in kind, and if it so elects, the same shall be delivered as produced and saved into tanks or other containers maintained upon said demised premises by said Lessee for that purpose, and such royalty oil may be stored without charge in such tanks or containers for a period of not to exceed thirty days, but at said Lessor's sole risk. At said Lessor's option, Lessee will purchase said royalty oil from said Lessor, and shall pay said Lessor therefor the current price paid by the Lessee for oil of like grade and gravity at the wells of production in the same vicinity."

"The royalties from oil and gas produced hereunder from said lands, or the proceeds thereof as aforesaid, shall be de-

livered and paid to and received by the Lessor as rent of said demised premises, and not otherwise; and when said royalties are paid in kind under the provisions hereof, the said petroleum oil shall be divided hereunder and said royalty delivered in kind to the Lessor on said demised premises, as hereinbefore provided.''

''All royalty oil which shall be sold to the Lessee hereunder, under the terms hereof, shall be paid for by it to the Lessor on or before the 20th day of the calendar month next succeeding that in which delivery of such oil shall have been made to the Lessee under such sale, and all royalty paid in kind shall be delivered to the said Lessor from time to time as the same is produced on said premises and stored and handled as herein provided.''

It should first be noted that in all operations under this lease, plaintiff elected to require defendant to purchase its royalty oil for cash.

Defendant uniformly, until September 1, 1930, purchased the royalty oil upon what is known as the ''observed gravity-net quantity'' basis and paid therefor the posted price of the Standard Oil Company for oil of such grade and gravity, which said price was its own current price. But plaintiff insists that such a system of accounting is not only in violation of the terms of the lease but is erroneous to such a degree as to make it fraudulent. Defendant insists that inasmuch as the lease neither in terms nor by necessary implication requires it to clean or otherwise process the royalty oil produced, it is the duty of plaintiff to accept the oil in kind as produced and saved or else to accept its current price in the field for unprocessed oil of like gravity.

▮ To more accurately grasp the issue between the parties it is necessary to state that the terms ''wet'' oil and ''clean'' or ''dry'' oil have a well-understood meaning in the trade. Wet oil is such a petroleum liquid as carries in cohesion with it more than 3 per cent by volume of water and sediment. Clean or dry oil is such a liquid as carries 3 per cent or less of said impurities. The base or impure content of the liquid is also known in the trade as the ''cut'' of the oil. When the gravity of the fluid in its crude state is taken, it is called its ''observed'' gravity. Free water found in the liquid is not considered a part of the gross fluid for the purpose, as it is easily drained off from the bottom of the tanks. Usually also a well, when first put

upon production, carries only dry or clean oil, but with increased pumping the encroachment of water becomes greater, and larger percentages thereof are emulsified with the petroleum. Oil is marketed upon the basis of its gravity as tested by the hydrometer. The instrument is immersed in the liquid as is likewise a thermometer. The readings on both instruments are taken and then, by use of Standard American Petroleum Institute tables, the hydrometer reading is corrected to conform to measurement at a temperature of 60° Fahrenheit. Upon this gravity reading as corrected, the prevailing price is applied to the net quantity of oil in the product. The net quantity of oil is found by actual dehydration of the entire volume of fluid or else by taking proper samples, applying to such samples the recognized A. S. T. M. standard tests, which disclose the percentage of water and other impurities; then by applying such percentage of deduction to the total volume of fluid, the approximate net quantity of oil is found.

Plaintiff insists that under the lease here involved it is the duty of defendant to clean the wet oil, either actually or theoretically, and then apply the gravity test to the cleaned fluid, which will thus give it a higher gravity reading than in its wet state. In other words, plaintiff contends that it was the duty of defendant to base its gravity test upon the same net substance that constituted the quantity or volume purchased. Upon the soundness of this view rests practically plaintiff's entire case.

It will be noted that the lease is silent both as to how the quality and how the quantity tests shall be made. Likewise, the lease fails to require defendant to prepare the royalty oil for pipe-line shipment in the event it is delivered in kind. To provide tanks for the storage of plaintiff's royalty oil is the only express obligation imposed. If delivery in kind is made, it is to be as produced and saved or as produced and stored in tanks on the premises. If this means a delivery of the gross fluid as produced, it certainly follows that, if required to purchase it, defendant must pay its own current price for the same substance. If the duty to theoretically clean is absent when the royalty oil is delivered in kind, it is absent when the royalty oil is to be purchased.

We are constrained to hold that the words "petroleum oil" and "royalty oil" found in the above-quoted para-

graphs of the lease mean the crude petroleum well fluid as produced, less the free water therein, that is, the petroleum fluid together with such water and other foreign matter as may be emulsified therein—the fluid in its natural state. We are strengthened in this conclusion by the context of the lease, wherein, in 38 or more places, these words or similar words are found. For example, by said lease the land was demised, together "with all petroleum, gas and all other hydrocarbon substances contained therein". The term of the lease was to be 20 years "and so long thereafter, not exceeding 10 years, as oil or gas is found thereon or therein in paying quantities", subject, however, to certain conditions, "for the purpose of drilling and boring for petroleum, oil, natural gas, and all other hydro-carbon substances of whatsoever kind or character". Again, the following language is found in said instrument: "upon the discovery of oil in paying quantities in any one of said test wells", etc. Again, "a well shall be deemed completed when drilling has ceased and said well shall either produce oil in paying quantities, or shall have been drilled to a depth of 3500 feet or more"; "for the purposes of this lease, a well shall be deemed to produce oil in paying quantities when it shall produce oil and/or gas in quantities sufficient to pay to pump, or otherwise secure and save". The lease provides what shall be done within 90 days after oil shall have been discovered on the leased premises in paying quantities. Another paragraph relates to pumping operations and provides: that defendant shall pump and operate all the wells to full capacity so long as the same "produce oil in paying quantities, except when the price of oil in Southern California, similar in quality to that produced hereunder, is depressed to 50 cents or less per barrel of 42 gallons each at the wells of production, as hereinafter set forth".

No one can say that the "cleaned" or "dry" product is referred to by the above language. Our construction of the lease conforms to the commonly understood meaning of the terms and is in every respect a reasonable deduction. In *Hammett Oil Co.* v. *Gypsy Oil Co.*, 95 Okl. 235 [218 Pac. 501, 502, 34 A. L. R. 275], it is said: "There was no evidence as to what the word 'oil' includes, when used in an oil and gas lease, or how the parties to the lease understood it, but a large amount of litigation has arisen over oil

and gas leases, and the construction of such contracts, and the word 'oil' as used in an oil and gas lease, has always been referred to by the courts and understood to designate the oil produced from a well, or crude petroleum in its natural state. There is nothing either in the contract or in the evidence to disclose that the parties in this lease contract used it in any other sense, but the contract does support the contention that it was used in its ordinary and popular sense, and refers to crude oil as it was produced from the mouth of the well.''

The fact that the lessee was to have the right to erect a cleaning plant on the premises does not affect this conclusion. All wet oil must be thus processed before refining can take place. Whether defendant did this processing on the leased premises or elsewhere is unimportant.

■ Nor is plaintiff's contention sound based upon a letter of defendant signed for it by one J. U. Stair, dated May 11, 1923, wherein it is stated: ''We think that the proper interpretation of the 'Oil Produced and Saved' clause is the actual clean oil which is delivered to the marketing company or pipe line.'' The subject of this letter was a net quantity accounting which plaintiff had questioned. The question of wet oil had not arisen as the wells at that time were producing only clean oil or oil with less than 3 per cent impurities, the average for said year being only 1.65 per cent. The writer stated that he referred to ''settled'' oil and had no reference to the basis for gravity reading. But anyway this writer's view of the meaning of said clause of the lease, standing alone, would not bind defendant to his interpretation thereof in the absence of reliance thereon by plaintiff to its injury.

■ Now, with failure of the parties to specify how or when the gravity and quantity tests should be made, we are compelled to refer to the customs and usages of the trade (Civ. Code, secs. 1644, 1646). It is not in dispute that as to quantity, the net oil content is the basis of sale. Neither is it disputed that the major portion of the oil produced in the Signal Hill field has been purchased, whether in the open market from lessors or from others, by defendant and its predecessor companies and the following companies: Union Oil Company of California, The Texas Company, Associated Oil Company, General Petroleum Corporation,

Richfield Oil Company, Standard Oil Company of California. Nor is it in dispute that these concerns, during the whole of the time in question prior to January 1, 1930, paid for the oil purchased upon the "observed gravity-net quantity" basis and this was true irrespective of the percentage of water and sediment therein. This the court especially found to be true. Many millions of barrels of wet oil were purchased in this manner. And this prevailing custom could easily have been ascertained by any interested or even casual inquirer and this the court likewise in effect found. The posted prices of the Standard Oil Company were used and applied to the gravity of the wet oil. Indeed, although the Standard Oil Company had no leases in this field, yet it was a large purchaser of wet oil therein and even at one time assigned a special pipe-line to the transportation of wet oil and uniformly bought it upon the observed gravity basis. Again, the evidence is not in conflict that defendant yielded to plaintiff the exact accounting it made to all other lessors with whom it was in the relation of lessee and to all others from whom it purchased wet oil. With each of them the gravity was taken of the gross fluid and the barrelage from the net oil content.

We have then this situation: Defendant has accounted to plaintiff upon the basis of the "current price paid by the Lessee for oil of like grade and gravity at the wells of production in the same vicinity". Not only this, but it has accounted to it for the full market price of the royalty oil. It therefore becomes unnecessary to consider the secondary defenses of defendant such as account stated, accord and satisfaction, estoppel, waiver, laches and limitations, or the further defense that the damages, if any, have not been properly measured. The same observation applies to the appeal from the order denying the motion to vacate the findings and judgment.

This conclusion also makes superfluous a consideration of the specifications upon which plaintiff relies to show fraudulent conduct on the part of defendant. Our conclusion is that defendant has followed the lease as well as the usages and practices of the trade and no evidence whatsoever of fraud is present. It may well be that a net oil content instead of a gross oil content would be the fairer base of the gravity reading. ■ But such was not the usage or cus-

tom at any time prior to the year 1930 and many of the larger companies still ·follow the old method. And those concerns which during 1930 did change their system of testing for gravity, made against the owner or seller a charge for dehydration. The slightest diligence on the part of plaintiff would have disclosed to it the uniform practice in the Signal Hill field as well as the same practice by defendant.

From what has been held above, it follows that paragraphs 1, 3, 4, 5, 8 and 9 of the judgment are erroneous. Paragraph 2 is also erroneous in decreeing a refund to plaintiff of charges for dehydration made by defendant for the period between September 1, 1930, and June 30, 1931. This is true because defendant was not required to pay upon the dry gravity of the oil unless the custom or usage obtaining in the field changed and, assuming that after January 1, 1930, it did so change, it is equally true that, in making the change, a charge was made for dehydration. This is the charge ordered refunded to plaintiff by said paragraph 2 of the judgment and for the above reason such allowance cannot be sustained.

The foregoing discussion being based upon uncontroverted facts applied to our construction of the written lease, it follows that each of the several findings of fact inconsistent with the conclusion announced is without evidentiary support.

### *Plaintiff's Appeal.*

As already noted, plaintiff complains of the failure to secure a judgment for further relief upon two of its contentions, which failure is evidenced by paragraphs 6 and 7 of the judgment. Our conclusion is that the court's action in each instance was so clearly correct that only a brief discussion of the points made is required.

The first contention arises under the terms of the amendment to the lease of March 14, 1924, which required the defendant to purchase the royalty gas produced under the lease and removed by it from the demised premises, at the rate of 10 cents per 1,000 cubic feet. But under a separate provision defendant was exempted from the wet or dry royalty payments with respect to all gas used or consumed in carrying on its production operations on the property. During all times here in question, to wit: from March 14, 1924, to September 1, 1930, defendant, with the full knowl-

edge and presumed acquiescence of plaintiff, did not use wet gas in said operations but on the contrary conducted all gas produced to a central absorption plant off the premises, where such gas was commingled with other gas produced elsewhere; then after all gas was submitted to the absorption process, a certain amount of the resultant dry gas was returned to the leased premises and there used by defendant. In accounting to plaintiff, defendant treated the dry gas so used as though it were wet gas and deducted the amount from the gross yield and paid plaintiff for its aliquot part of the net amount after such deduction. The court found, upon sufficient evidence, that dry gas was the more effective and the more economical and further that plaintiff was benefited by the practice because if wet gas had been used, an equal amount, at least, would have been consumed. The technical contention that by removing all gas from the premises, defendant lost its claim for deductions to cover gas used on the lease, is wanting in substance. The finding that plaintiff has not been damaged in the sum of $30,841.40, or any other sum, must be sustained.

█ Lastly, plaintiff insists that a loss occurred to it during the period from January 1, 1923, to September 1, 1930, in the sum of $75,641.26, and interest thereon to June 15, 1931, as a necessary consequence of the faulty system used by defendant in arriving at the net quantity volume of oil produced and saved under the lease. The court in effect found that such a loss occurred but this finding was offset by the further finding that no feasible method existed by which such loss might be measured. The lease itself is silent as to the method by which said test shall be made. All parties agree that one standard test at least was the centrifuge test, aided by the use of a solvent or diluent. So far as here pertinent, it may be stated that such test is founded upon the principle that water and other foreign substances are heavier than oil. By placing a sample of the oil in a rapidly rotating tube, centrifugal force will have the effect of shattering or breaking up the emulsion of oil and foreign substances therein and when the process of rotation is completed, the water and foreign matter will be at the bottom of the tube and the oil on top, where appropriate readings may be taken thereof. If the breaking up process

is incomplete, necessarily oil will be included in the waste matter or the "cut", and this oil will be lost in estimating the net oil volume.

To aid the above process and insure greater success, diluents or solvents are mixed with the oil at the initiation of the test. Prior to August, 1926, the solvent employed was equal parts of bisulphide and gasoline; subsequently the use of benzol was instituted. The test with either of these solvents was a standard method, producing about equivalent results. Benzol as a solvent or diluent was indorsed as a substitute for gasoline and bisulphide in 1926 by the American Society for Testing Materials, an institution universally recognized as the exponent of methods of testing materials. Defendant continued to use benzol from 1926 until about June 28, 1930, at which time, with some of the other companies, it substituted therefor the use of phenol as such diluent. During the entire period here involved the current method used by defendant had the indorsement of the American Petroleum Institute, the United States Bureau of Mines and the above-mentioned American Society for Testing Materials.

Another test would have been what is known as a distillation test and it could have been employed, but it was not generally used prior to 1930, and, moreover, such test extracts only water and does not remove solid foreign matter present in the sample. This test is also susceptible of much error and is more or less impracticable for field laboratory work. The use of phenol in the centrifuge test came about by a slow process of experiment and it did not become an acknowledged substitute, in the Signal Hill field at least, until about June 28, 1930. Plaintiff rests its full contention upon the claim that it was the duty of defendant either to adopt the distillation test or earlier employ phenol as a solvent in the centrifuge test. Enough has been said to show that defendant was at all times diligent, employing standard tests, and no substantial basis exists for claims at this late date that better methods could have been employed. We therefore see no reason for considering the highly speculative methods employed by plaintiff in estimating the saving that might have resulted from the use of some other testing method.

Moreover, we concur in the view of the trial court that no proper basis was shown for estimating such losses, if it be assumed that they have occurred. This issue, as well as the whole case, suggests the absence of ordinary diligence on the part of plaintiff in ascertaining the unconcealed practices of the trade and of defendant respecting the basic elements of its contract.

The appeal of defendant is sustained *in toto* and the appeal of plaintiff denied *in toto*. Accordingly, the judgment is reversed as to paragraphs 1, 2, 3, 4, 5, 8 and 9 thereof and as to paragraphs 6 and 7 thereof it is affirmed. The cause is remanded for further proceedings in accord with the holding hereinabove outlined.

Curtis, J., Waste, C. J., Shenk, J., Seawell, J., and Thompson, J., concurred.

Rehearing denied.