[No. B038650. Second Dist., Div. One. Sept. 29, 1989.]

ATLANTIC RICHFIELD COMPANY et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

534

COUNSEL

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Alan V. Hager, Deputy Attorney General, for Defendants and Appellants.

O'Melveny & Myers, Charles C. Read and Gregg Oppenheimer for Plaintiffs and Respondents.

OPINION

HANSON, J.—Plaintiffs Atlantic Richfield Company, a Pennsylvania corporation, Mobil Oil Corporation, a New York corporation (hereinafter ARCO) brought an action for declaratory and injunctive relief against defendants, the State of California and members of the State Lands Commission (hereinafter the State).

The declaratory relief cause of action sought resolution of a dispute that had arisen between ARCO and the State over the manner in which royalties payable to the State by ARCO under two offshore oil and gas leases were to be computed. More specifically, the parties disagreed concerning the deductibility of processing and transportation costs in computing the royalties due the State on dry gas, natural gasoline and other products extracted and saved from gas produced under the leases. ARCO maintained that these costs were deductible, and the State maintained that they were not.

The cause of action seeking to enjoin the State from declaring a forfeiture of the leases for nonpayment of royalties was rendered moot by an agreement between ARCO and the State whereby ARCO paid under protest 70 percent of the gas royalties, the portion which it estimated covered processing and transportation costs. (At the time this matter was heard, it was

represented to the court that the funds paid under protest exceeded $1.7 million.) State's answer to the complaint put at issue the deductibility under the leases of gas processing and transportation costs and, if deductible, the proper components of such costs.

ARCO and the State entered into a stipulation in which they agreed to the procedures for presenting to the court the issues of (1) the deductibility under the leases of gas processing and transportation costs and (2) the composition of those costs if deductible. It was agreed that the first issue, involving interpretation of the governing statute, Public Resources Code section 6827, was a question of law, and could be presented by cross-motions for summary adjudication of issues upon a statement of undisputed facts. The second issue, the composition of the deductible costs, would be reached only if the court decided the first issue in ARCO's favor and, if reached, would be presented after the parties had an opportunity for discovery.

Both parties appeared at hearing with the belief that there were no triable issues of fact as to the first issue. The trial court judge, at the second hearing, advised the parties that there were triable inferences to be made from the stipulated facts, and left it to the parties to decide whether they would agree to regard the proceedings in which they were participating as a trial of the first issue.

The parties so stipulated. After more briefing and considerable oral argument, the trial court made an interlocutory order favoring plaintiffs, ARCO. The order provided that pursuant to section 6827 of the Public Resources Code, royalties due the State on dry gas, natural gasoline and other products extracted and saved from the gas produced from the two leases were payable in, or as a percentage of the market price of, unprocessed gas as it exists at ARCO's offshore wells. The order also stated that the *market* price at the wells may be determined by deducting transportation and processing costs from the onshore market price of the described items.

ARCO and the State arrived at a stipulation on the composition of the deductible costs, including a provision for entry of judgment in favor of ARCO, subject to the right of the State to contend on appeal that the trial court erred in its ruling on the issue of deductibility. Judgment was filed and entered. The State has taken a timely appeal from the judgment, raising the single issue of the propriety of the trial court's ruling that processing and transportation costs may be deducted when computing the State's royalties on the gas produced by these leases.

## STANDARD OF REVIEW

■ As has often been said, "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error. [Citations.]" (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, pp. 276-77.)

■ When the question of interpretation of a writing, including a statute, is presented to an appellate court, the standard of review may vary depending on whether extrinsic evidence was admitted in the trial court to assist or persuade that court in adopting one interpretation or another of the writing in question. If extrinsic evidence was introduced below, a reviewing court applies the general appellate principle of conflicting evidence. If it was not, a reviewing court conducts independent review, and need not defer to the trial court's judgment on a question of law. (9 Witkin, Cal. Procedure, *supra,* §§ 292-295, pp. 303-306.)

■ Where, as here, the parties submitted the facts to the court pursuant to stipulation, and further agreed that the trial court would be drawing inferences from those facts in making its determination, it is our view that the general rule of conflicting evidence is applicable on appeal. Thus, any reasonable construction by the lower court of Public Resources Code section 6827, the statute in question, will be upheld.

## STATEMENT OF FACTS

In 1964 and 1965, the State Lands Commission issued to the predecessors in interest of plaintiffs, ARCO, pursuant to competitive bidding, State Oil and Gas Leases Public Resources Code (PRC) No. 3120 and PRC No. 3242. These leases, along with all the offshore state oil and gas leases issued after 1957, have sometimes been called Cunningham-Shell leases because they were issued pursuant to the provisions of the Cunningham-Shell Tidelands Act (Stats. 1955, ch. 1724, p. 3165) and the Cunningham-Shell Tidelands Act Amendments (Stats. 1957, ch. 2166, p. 3837.) These acts govern the issuance of state oil and gas leases on tide and submerged lands, and are found in division 6 of the Public Resources Code.

ARCO's two leases are currently in full force and effect and are operated by Atlantic Richfield. The leases are adjacent and together cover approximately 7,600 acres of tide and submerged land in the Santa Barbara Channel near Goleta. Production from both leases is from Platform Holly, a

drilling and production platform located on lease PRC No. 3242 about two and one-half miles offshore.

Oil and gas production from the two leases began in 1967 and has continued through the present. The early production was sweet oil and gas from the Rincon and Vaqueros-Sespe formations. Sweet oil and gas requires very little processing to make it marketable for commercial and domestic use. The limited processing of sweet gas consists of removing the liquid constituents for the purpose of marketing separately the resulting dry gas and extracted gas liquids. The record before us establishes that the cost to ARCO of processing the sweet gas from the leases was minimal, i.e., $450 per month, and that ARCO paid royalties to State without deducting costs.

In 1969, ARCO discovered substantial deposits of sour oil and gas in the Monterey formation on both leases. Sour oil and gas contain significant quantities of sulphur compounds, notably hydrogen sulfide. Sour gas cannot be used for commercial or domestic purposes unless the sulphur compounds are removed; the gas is lethal unless the hydrogen sulfide is removed, and the Monterey formation discovery yielded gas with very large concentrations of hydrogen sulfide. It was the first such discovery on any Cunningham-Shell lease.

In the mid-1970's, ARCO began the lengthy and expensive process of planning, obtaining permits for and constructing facilities at the location of its existing onshore tank farm at Ellwood, near Goleta, to remove most of the hydrogen sulfide, carbon dioxide and other chemical impurities from the sour oil and gas.

In the process of making its decision to construct onshore processing facilities, ARCO prepared analyses of the economics of construction and operation. These analyses did not include projected deductibility of the costs of processing the sour gas and oil, which were very substantial. ARCO, however, decided to proceed with its own processing facilities, rather than sell the sour wet gas to an independent processor at a substantial discount.

With the completion of the Ellwood processing facilities, ARCO has been able to market substantial volumes of Monterey gas. The construction and operating costs of the Ellwood gas processing facilities have been large. Projected by ARCO to be about 70 percent of the price it would receive from the sale of the processed products, the actual costs have so far consumed a larger share, sometimes equalling or exceeding 100 percent of the sales price of the processed products. In contrast to the minimal cost of

producing sweet gas, transportation and processing costs of the sour gas have been $525,000 per month.

In April 1978, ARCO sought from the State its agreement to calculate the royalty on these sour gas products at the market price less the costs of transporting the produced sour wet gas to the Ellwood processing plant and processing it. ARCO's position was that the leases provided for payment of royalties to the State at their value at the wellhead, determining by working back from the market price to the value of the products after deducting the costs of rendering them marketable.

The State rejected this position, maintaining that the leases, which must comply with the Public Resources Code, provide that the State is to receive 16⅔ percent of the dry gas, natural gasoline and other gas products in kind or at their current market price without any deductions for processing and transportation costs.

The trial court rejected the State's arguments in support of nondeductibility, and ruled in favor of ARCO. We affirm the trial court's judgment; had we exercised the function of independent review, we would have reached the same conclusion as the trial court concerning interpretation of the governing statute.

### CONTENTIONS ON APPEAL

At the time the leases were issued to ARCO, Public Resources Code section 6827 provided, in relevant part, the following: "When state lands, . . . [are] including tide and submerged lands, offered for lease by the commission [State Lands Commission], . . . the commission shall specify . . . a sliding scale royalty [on oil] commencing at not less than 16⅔ percent up to a maximum percentage specified in the invitation to bid to be paid on the average production of oil per well per day under such lease, and a royalty of 15 percent as specified in the invitation to bid on dry gas, natural gasoline, and other products extracted and saved from the gas produced under such lease, except gas used for lease use or reinjection [into the leased] lands . . . . *Such royalties shall be paid in kind or as a percentage of the current market price at the well of,* and of any premium or bonus paid on, *the production removed or sold from the leased land* . . . ." (Stats. 1955, ch. 1724, § 7, p. 3169 (italics added); see Historical Note, West's Ann. Pub. Resources Code (1977 ed.) § 6827, p. 188.)

The language emphasized in the text of the statute is the crux of the dispute between the parties; specifically, what the Legislature intended

when it declared that royalties were to be computed in kind or as a percentage "of the current market price at the well."

On appeal, as in the trial court, defendant State contends that (1) the legislative history of Public Resources Code section 6827 shows "unmistakably" that the Legislature intended that the royalty to be paid to the State by lessees of Cunningham-Shell leases was to be a percentage of the processed products or the market price for the processed products, with no deduction for the costs of transporting the produced gas to an onshore processing facility and processing the gas to obtain commercially marketable gas products; (2) the conduct of the parties, i.e., their practical construction of the statute, demonstrates that they accepted an interpretation of the statute disallowing costs in computing the royalties; (3) this court should regard the language employed in the statute, i.e., "at the well," as a "vestigual remnant with no useful function," excise it by judicial surgery, and reverse the judgment entered below.

Our brief discussion of these contentions follows.

### DISCUSSION

### I.

Defendant State, in urging its interpretation of what the Legislature intended by providing that royalties would be determined by taking a percentage of "market price at the well" concedes that "at the well" has a meaning ordinarily understood and accepted in the oil and gas industry and in the case law which has considered the meaning of that term.

█ The term "at the well," when used with reference to oil and gas royalty valuation, is commonly understood to mean that the oil and gas is to be valued in its unprocessed state as it comes to the surface at the mouth of the well. (*Piney Woods Country Life School* v. *Shell Oil Co.* (5th Cir. 1984) 726 F.2d 225, 240, cert. den. *Shell Oil Co.* v. *Piney Woods Country Life School* (1985) 471 U.S. 1005 [85 L.Ed.2d 161, 105 S.Ct. 1868]; 3 H. Williams, Oil and Gas Law (1981) § 645.)

█ When the term "at the well" is used in connection with "market price," other established principles apply. It is the rule in California that unless there is clear language to the contrary, the lessor of an oil and gas lease, such as State, bears its proportionate share of processing costs incurred downstream of the well. (*Alamitos Land Co.* v. *Shell Oil Co.* (1935) 3 Cal.2d 396 [44 P.2d 573].) In addition, it is commonly understood that "market price at the well" is often determined by working back from the

price at the point of sale, deducting the cost of processing and transportation to the wellhead, to determine "market value at the wellhead"; (for a clear exposition of this rule, see G. Siefkin, *Rights of Lessor and Lessee with Respect to Sale of Gas and as to Gas Royalty Provisions,* Sw. Legal Foundation Fourth Annual Institute on Oil and Gas Law and Taxation (1953) p. 202.)

■ It is contended, however, by defendant State that Public Resources Code section 6827 was inartfully drafted because the statute refers to market value "at the well" where *processed* products are not found, and that despite the inartful drafting—reflected not only in the 1955 legislation but in the 1957 legislation as well—the Legislature intended that royalties be computed without deducting costs. Despite adept argument concerning the legislative process as it applied to the Cunningham-Shell leases, defendant State is not able to adequately explain why current market price "at the well" was retained in 1957 with respect to *both* proven and unproved leases, when previously it had been employed by the Legislature for only proven leases, i.e., where oil and gas had been found.

The trial court found the fact that the Legislature, when it amended Public Resources Code section 6827 in 1957, retained the "market value at the well" for both unproven leases and proven leases was dispositive of legislative intent because it could be assumed that the Legislature knew what was implied concerning deductibility in using the term "market value at the well." The trial court found also that language in the statute describing less than full deductibility on certain lessee costs at various times was not express authorization of those costs but language of *limitation,* placed there on the unfortunately inadequately expressed assumption that in the absence of such limiting language, all costs were deductible.

We have concluded that the trial court's interpretation of section 6827 is a reasonable one, and more likely than not is the correct interpretation of what the Legislature intended. In our view, it is also a practical and fair interpretation, one that will encourage rather than discourage such efforts as the Ellwood project.

## II.

■ Defendant State argues that the fact that ARCO did not deduct the cost of processing and transporting its sweet gas, prior to the Ellwood project, in paying royalties to the State demonstrates that ARCO understood such items were not deductible pursuant to Public Resources Code section 6827. It is further argued that the fact that ARCO's economic analyses concerning the processing of sour gas at Ellwood did not take into account deductibility of transportation and processing costs is also indicative of that understanding.

This argument was made in the trial court, and was rejected, after ARCO disclaimed such understanding and pointed out that the costs associated with getting sweet gas ready for the market were so economically insignificant it would have been counterproductive from an accounting standpoint to make an issue of the matter. As for the economic projections made prior to Ellwood, ARCO claims that the projections did include a margin of profit, whether costs were deductible or not, and that the decision to construct facilities at Ellwood was made without reference to the deductibility factor. The trial court was thus faced with a choice of inferences to be drawn from the failure of ARCO to project costs as deductible in the economic analyses prepared by ARCO concerning the sour gas processing. Both inferences were reasonable, in our view; the trial court chose not to adopt the inference urged by the State, and we uphold that determination on this appeal.

## III.

■ Comparing the language "at the well" to a human being's appendix—described as a "vestigial remnant with no useful function"—we are asked to excise from the statute "by judicial statutory construction" the language found offensive.

Well established rules of statutory construction by the courts, however, preclude such excision. ■ When interpreting a statute, a court determines the enacting body's intent and purpose, and construes wording "according to the usual, ordinary import of the language" used in the statute. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

■ "[A] court must look first to the words of the statutes themselves, giving to the language its usual, ordinary import and according significance, if possible, *to every word, phrase and sentence* in pursuance of the legislative purpose." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323], italics added.)

■ This is not a case where literal interpretation would result in absurdity, requiring adroit interpretation by a reviewing court or "judicial excision." It is simply a situation where a term was employed by the Legislature which has an established meaning but unfortunately was not fully expressed in the statute. We decline defendant State's invitation to excise "at the well" from the language of Public Resources Code section 6827.

## Disposition

The judgment is affirmed.

Spencer, P. J., and Devich, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 14, 1989.