FILED
United States Court of Appeals
Tenth Circuit

January 9, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE ANDERSON LIVING TRUST f/k/a
The James H. Anderson Living Trust; THE
PRITCHETT LIVING TRUST; J. RICHIE
FIELDS; THE TATUM LIVING TRUST;
NEELY-ROBERTSON REVOCABLE
FAMILY TRUST,

        Plaintiffs - Appellants,

v.

        No. 16-2124

ENERGEN RESOURCES
CORPORATION,

        Defendant - Appellee.

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1: 13-CV-00909-WJ-CG)**

---

Bradley D. Brickell, Brickell & Associates, P.C., Norman, Oklahoma (Margaret M.
Branch and Cynthia L. Zedalis, Branch Law Firm, Albuquerque, New Mexico, Karen
Aubrey, Law Office of Karen Aubrey, Santa Fe, New Mexico, and Brian K. Branch, Law
Office of Brian K. Branch, Albuquerque, New Mexico, with him on the briefs) for
Appellants.

Christopher A. Chrisman, Holland & Hart LLP, Denver, Colorado (Bradford C. Berge,
Holland & Hart LLP, Santa Fe, New Mexico, Jessica M. Schmidt, Holland & Hart LLP,
Denver, Colorado, with him on the brief) for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **HARTZ** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

Fossil fuels are the decomposed remains of pre-historic flora (coal) and fauna (oil and gas). They have driven the world's economy (particularly that of the United States) for over a century. Discovering marketable deposits, extracting them from the ground, refining them, and delivering them to consumers in useful form is big business, on one hand fraught with risk and on the other richly rewarding. That being so, it has attracted the attention of governments as a lucrative source of tax revenue as well as royalties, bonuses, etc., derived from government-owned reserves and as a way of directing public policy. Since oil and gas are the most energy dense[1] and convenient of the fossil fuels, litigation and regulation abound with respect to them. But, in large measure mineral owners (private and public) and those involved with mineral producers have been free to contractually "strike their own deals." Myriad matters are involved; here we are principally concerned with construing the language of leases in accordance with prevailing law—both statutes and case law. Statutes, of course, properly direct policy. So do cases, more covertly, but no less dramatically.

Oil and gas law is rife with duties owed by the lessee to the lessor. Some of those

---

[1] For a comparison of the energy density of many combustibles, visit: https://people.hofstra.edu/geotrans/eng/ch8en/conc8en/energycontent.html.

duties are expressed in an agreement (the lease). Others duties are imposed by the courts as implied covenants. *See generally*, 6 Peter Linzer, Corbin on Contracts § 26.1 (Joseph M. Perillo ed. 2010). This case involves the implied covenant to market gas. It benefits the lessor, in particular, by insuring that the lessee uses reasonable efforts to market potential production. That way the lessor can enjoy the benefits the lease provides. This case deals with that implied covenant, but more particularly with what has come to be known as the marketable condition rule. In its purest form, that advocated by appellants, it not only requires the lessor to market the gas, but to do so solely at its expense. Colorado has adopted a version of the marketable condition rule, which applies only when the lease does not provide otherwise. Years ago we predicted New Mexico would not adopt the marketable condition rule and so far neither the legislature nor the New Mexico Supreme Court has done so. Accordingly, our decision rests on the terms of the leases involved. We rely on the text of the leases and the meaning commonly ascribed to the language used (the essence of the common law, which reflects the practices of the community, rather than dictates practices to the community).

The San Juan Basin, located in northwestern New Mexico and southern Colorado, is a rich source of oil and natural gas. Energen owns and operates oil and gas wells in the Basin.[2] Its wells are subject to leases and other agreements (many of which are quite old)

---

[2] Energen has since sold most of its interests in the wells to Southland Royalty Company.

requiring it to pay a monthly royalty or overriding royalty[3] on production to the Anderson Living Trust, the Pritchett Living Trust, the Neely-Robertson Revocable Family Trust (N-R Trust), and the Tatum Living Trust.  The royalty interests of the Anderson, Pritchett, and N-R Trusts (collectively the New Mexico Trusts) derive from wells located in New Mexico, the Tatum Trust's royalty interest from wells located in Colorado.

Believing Energen was systematically underpaying royalties, all of the Trusts filed a putative class action complaint against it.[4]  The New Mexico Trusts claimed Energen was improperly deducting from their royalties their proportionate share of (1) the costs it incurs to place the gas produced from the wells in a marketable condition (post-production costs) and (2) a privilege tax the State of New Mexico imposes on natural gas processors (the natural gas processors tax).  They also alleged Energen had not timely paid royalties or interest thereon, as required by the New Mexico Oil and Gas Proceeds Payments Act.  Both the New Mexico Trusts and the Tatum Trust further claimed Energen was wrongfully failing to pay royalty on the gas it used as fuel.

---

[3] The term "overriding royalty" is used to describe a royalty carved out of a working interest created by an oil, gas, or mining lease.  Usually, the reservation of an override involves the transfer of a lease in which the lessee-assignor . . . retains an interest in production in the form of an overriding royalty.  The overriding royalty interest is an interest free of the expenses of production.  It is a nonpossessory interest in land.

*Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 69 n.2 (N.M. 1993) (citations omitted).

[4] The district judge stayed the Trusts' motion for class certification pending this appeal, which deals only with the interests of the named parties.

- 4 -

The district judge dismissed the New Mexico Trusts' marketable condition rule claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and entered summary judgment in favor of Energen on the remaining claims. All of the Trusts appeal from those judgments.[5] Our review is de novo. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (grant of summary judgment is reviewed de novo); *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014) (grant of motion to dismiss under Fed. R. Civ. P. 12(b)(6) is reviewed de novo).

For the most part we agree with the district judge, particularly in the following respects:

*First*, under New Mexico law, Energen had the duty to diligently market the gas for the benefit of the New Mexico Trusts but that duty <u>did not</u> prohibit it from deducting from their royalty payments their proportionate share of post-production costs—those costs necessary to make the gas marketable (i.e., the marketable condition rule does not apply in New Mexico).

*Second*, nothing in the New Mexico Natural Gas Processors Tax Act or other New Mexico law prohibited Energen from deducting the Trusts' proportionate share of the tax from their royalties.

*Finally*, the Anderson and Pritchett Trusts' lease allows Energen to use produced

---

[5] The judgments did not dispose of all of the Tatum Trust's claims; some remain pending in the district court. However, the judge certified his judgments under Fed. R. Civ. P. 54(b). Upon independent review, we deem the certification proper. We have jurisdiction over all issues presented for review.

gas as fuel without paying royalty on it.

In some respects, we part ways with him. They relate to: (1) the fuel gas claims made by the N-R Trust and Tatum Trust and (2) the New Mexico Trusts' claim under the New Mexico Oil and Gas Proceeds Payments Act. As to the former, the N-R Trust's overriding royalty agreement requires royalty to be paid on all gas produced, including that gas used as fuel. And the Tatum Trust's leases explicitly prohibit Energen from deducting post-production costs (Energen treats its use of the fuel gas as an in-kind post-production cost). Moreover, the "free use" clauses and royalty provisions in the Tatum Trust's leases limit the free use of gas to that occurring on the leased premises. Because use of the fuel gas occurs off the leased premises, Energen owes royalty on that gas. With regard to the latter, the judge was right in permitting Energen to hold funds owed to the N-R Trust in a suspense account until a title issue concerning a well was resolved in favor of that Trust. However, he did not address whether the N-R Trust was entitled to statutory interest on those funds. It was so entitled, yet the current record (at least as we read it) does not show interest to have been paid on the funds.

We now explain. Because all claims do not apply to all appellants, we discuss the issues separately, providing a brief background of the facts relevant to each.[6]

_____

[6] In the district court, all of the Trusts alleged Energen breached their royalty agreements by failing to pay royalty on "drip condensate," "'the portion of a gas stream that becomes liquid during the transmission of the gas from the leased premises to a processing plant.'" *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 856 (N.M. 2012) (quoting 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law*, at 296.1 (2011)). The judge entered summary judgment in Energen's favor on the New Mexico Trusts'

(Continued . . .)

- 6 -

## I. Marketable Condition Rule—New Mexico Trusts

A. *Background*

There is no market at the wellhead on the leased properties for the gas <u>produced</u> from Energen's wells. *See* 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law*, at 830 (2011) (defining "[p]roduction of gas" as "[t]he act of bringing forth gas from the earth"). The gas must first be gathered, compressed, dehydrated, and treated.[7] Energen contracts with third-party companies to perform these services. It then sells the <u>processed</u> gas at the tailgate of the third-party processing plants to various energy companies.

Energen pays the New Mexico Trusts, as royalty, a portion of the downstream sales price. However, it deducts from that price each Trust's proportionate share of the

---

drip condensate claim; Energen did not seek summary judgment on the Tatum Trust's drip condensate claim, which remains pending in the district court. The New Mexico Trusts identify their drip condensate claim as an issue in their opening brief but otherwise fail to develop it, providing no argument or legal authority to support it. They have waived the issue and we do not consider it. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) ("merely including an issue within a list [of issues is not considered] adequate briefing"; issues that are not adequately briefed will be deemed waived (quotation marks omitted)).

[7] The processing of natural gas into a marketable condition is complicated and depends on whether the gas comes from an oil well (casinghead gas), gas well (conventional natural gas), or from coal seams (coalbed methane gas). The intricate details are not relevant to our resolution of this appeal so we decline to outline them here. For a detailed discussion of the process, see *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 849-50 (N.M. 2012). For the intensely interested, Wikipedia provides a primer, including a discussion of drip condensate, which is not at issue in this appeal (*see supra* note 6). *See* https://en.wikipedia.org/wiki/Natural-gas_processing; https://en.wikipedia.org/wiki/Natural-gas_condensate. Since Wikipedia can be edited by any user, its accuracy is uneven. Nevertheless, when <u>carefully</u> considered, it can be useful.

fees it pays to third-party companies to make the gas marketable (post-production costs).

The New Mexico Trusts claim this deduction is improper because, in their words, New Mexico law imposes an implied duty on Energen to market the gas for the benefit of the royalty owners and that duty necessarily prohibits Energen from deducting post-production costs from their royalty payments (generally referred to as the marketable condition rule).[8]

The New Mexico Trusts' leases set the basis for royalty payments as the "market value at the well" or the "prevailing field market price." (Appellants' App'x at 342 (N-R Trust), 338 (Anderson and Pritchett Trusts).) Determining those amounts, however, is not straightforward, because there is no market "at the well" for gas produced in the San Juan Basin. As we explained in *Abraham v. BP America Production Co.*:

> In order to determine the market value of the unprocessed gas at the well, producers sell refined natural gas and NGLs [natural gas liquids] at the tailgate of the processing plant (i.e., after processing) to establish a base sales amount, and deduct from that amount costs for transportation, processing, etc. This is called a "netback" or "workback" method, and it is widely accepted as the best means for estimating the market value of gas at the well where no such market exists.

685 F.3d 1196, 1200 (10th Cir. 2012).

Properly understood, the netback method is not a means of cost-shifting; it is a means of determining the net profit on the oil and gas by "netting" the gross profit. The post-production expenses are not subtracted from the sales amount because the royalty

---

[8] The New Mexico Trusts <u>do not</u> claim any of these costs do not qualify as "post-production" costs or are otherwise unreasonable. Their argument is limited solely to applicability of the marketable condition rule in New Mexico.

owners are responsible for post-production expenses; they are subtracted as an accounting mechanism to determine the market value at the wellhead. Stated differently, "value added" to the gas produced at the wellhead solely through the effort and expense of the lessee must be deducted from an established market price of the improved product in order to make an accurate estimate of the value of the gas at the wellhead. In simple terms, if [A] the market value at the wellhead + [B] the value added in the production process (post-production costs)[9] = [C] the value of the processed natural gas (the sales price of the processed gas), then [C] – [B] = [A]. Subtracting [B] does not shift some of the costs of production to the lessors; it is an accounting adjustment designed to effectuate the intention of the parties as it is expressed in the parties' agreement—the lease. The Fifth Circuit explained this rationale years ago:

> [I]n the analytical process of reconstructing a market value where none otherwise exists with sufficient definiteness, all increase in the ultimate sales value attributable to the expenses incurred in transporting and processing the commodity must be deducted. The royalty owner shares only in what is left over, whether stated in terms of cash or an end product. In this sense he bears his proportionate part[] of that cost, but not because the obligation (or expense) of production rests on him. Rather, it is because that is the way in which [one] arrives at the value of the gas at the moment it seeks to escape from the wellhead.

*Freeland v. Sun Oil Co.*, 277 F.2d 154, 159 (5th Cir. 1960).

To recap: It is incorrect to assert, as the Trusts do, that royalty owners are "bearing

---

[9] These post-production costs are similar to the accounting term, Cost of Goods Sold (COGS). *See* https://www.investopedia.com/terms/c/cogs.asp ("Cost of goods sold (COGS) is the direct costs attributable to the production of the goods sold in a company. This amount includes the cost of the materials used in creating the good along with the direct labor costs used to produce the good.").

- 9 -

post-production costs." They are not.[10] With that matter now settled, we press on to the marketable condition rule.

B. *New Mexico Has Not Adopted the Marketable Condition Rule*

As we will explain, the New Mexico Supreme Court has decided oil and gas well operators have a duty to market the gas for the benefit of the royalty owners and that duty is one implied as a matter of law (irrespective of the parties' agreement). *See Davis v. Devon Energy Corp.*, 218 P.3d 75, 86 (N.M. 2009). However, it has yet to decide whether that duty includes the marketable condition rule.[11] Normally, in such circumstances, we would attempt to predict what that Court would do. *Coll v. First Am.*

_____

[10] The following example may help. Suppose a car salesman has a contract giving him a 10% commission per car, based on the price the dealership paid to acquire the car. Whether the car is marked up $5,000 or $10,000, his commission does not change, since it is based on what the dealership paid to acquire the car. One day he sells a car at a $5,000 mark-up for a gross profit of $25,000. When it is time to pay his commission, no one can find the bill giving the price the dealership paid for that car. But they all agree it was sold for $25,000 at a mark-up of $5,000. Of course, that is all they need. By subtracting the mark-up from the gross price, they figure out the dealership must have paid $20,000 for the car. The salesman gets his $2,000 commission. In that context, we see how little sense it would make to say that the salesman is "bearing the cost" of the dealership's mark-up, because we subtracted the mark-up from the gross profit. We only subtracted the mark-up to figure out what the dealership paid for the car, which is the contracted-for basis of the salesman's commission. This is also how the netback calculation works, and it makes just as little sense to say that the royalty owners are bearing the post-production costs. The point is to calculate the royalty payments based on the market value at the wellhead—the price that would have been paid at the wellhead if there were a market there.

[11] Colorado, on the other hand, appears to abide by what the parties' agreement says on the matter. *See Garman v. Conoco, Inc.*, 886 P.2d 652, 653-54, 659-60 (Colo. 1994) (en banc) (when a royalty agreement is silent with respect to allocation of post-production costs, the implied duty to market prevents the lessee from deducting those costs from the royalty payment).

- 10 -

*Title Ins. Co.*, 642 F.3d 876, 886 (10th Cir. 2011).  However, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, *and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue*."  *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (emphasis added).

The district judge decided the issue was put to rest in *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005).  Energen argues we are obligated to honor *Elliott*'s holding.  We agree.

C. *Elliott Decides the Issue*

In *Elliott*, the royalty agreement required the well operators to pay Elliott Industries a royalty on the "'market value of the gas at the well.'"  407 F.3d at 1100.  To establish that value, the operators deducted their post-production costs from the downstream sales price, including 39% of the natural gas liquids, which the operators retained as an in-kind fee for their processing services (i.e., the netback or workback method, *see supra* at 8-10).  *Id.*  Elliott objected to the 39% in-kind deduction, arguing, among other things, it was not a legitimate post-production cost and its deduction results in an underpayment of royalty.  *Id.* at 1100, 1107.  It claimed the operators had an implied duty to market the gas, which also prohibited them from deducting post-production costs from the royalty payment.  *Id.* at 1113.  We concluded the operators had complied with the implied duty to market under New Mexico law—they were actively producing gas, processing it, and selling the refined natural gas and natural gas liquids. *Id.* (citing *Darr v. Eldridge*, 346 P.2d 1041, 1044 (N.M. 1959) (the implied duty to

- 11 -

market requires oil and gas well operators/lessees "to make diligent efforts to market the production in order that the lessor may realize on his royalty interest.") (quotation marks omitted)).

Elliott (like the New Mexico Trusts here) claimed the implied duty to market included the marketable condition rule, which prohibited the operators from deducting the costs necessary to make the product marketable, including the cost of removing the natural gas liquids from the gas, in calculating the value of the gas at the wellhead under the netback method. *Id*. at 1113-14. Not so, we said: "*This conception of the implied duty to market finds no support within New Mexico case law*." *Id*. at 1114 (emphasis added).

Although the New Mexico Trusts acknowledge *Elliott*, they provide a host of technical reasons why we should ignore it. Energen, of course, presents contrary arguments. That particular debate may seem arcane and the arguments tedious, but the discussion is necessary. So, as some residents of the Tenth Circuit might say: Saddle up!

D. *Dicta*

The New Mexico Trusts tell us *Elliott*'s discussion of the marketable condition rule is *dicta*. According to them, the panel had already decided the implied duty to market claim failed because Elliott had dismissed its claim for breach of the royalty agreement. They are incorrect, both factually and legally.

Elliott did not dismiss its breach of contract claim; it never brought one. 407 F.3d at 1107 ("Elliott . . . has never asserted an unequivocal and straight-forward contract

- 12 -

claim alleging a breach of [the operators'] express obligations to pay royalties. In fact, Elliott steadfastly disclaims any cause of action for breach of an express contract."). Our discussion of the marketable condition rule was not dicta.

In lieu of raising a breach of contract claim, Elliott relied on the implied duty to market, claiming that duty should govern because the contract did not specifically address the 39% in-kind processing fee. *Id*. at 1111. According to Elliott, that duty prohibited the operators from deducting from the royalty payment the cost of removing the natural gas liquids from the gas. *Id*. at 1107-08, 1113. We rejected that argument on two grounds.

First, Elliott could not show that an implied duty to market existed in that case because other than asserting that the royalty agreement did not address the 39% processing charge, it did not otherwise rely on the agreement. *Id*. at 1113. Without the agreement, we could not determine "whether any implied duty to market was intended by the parties or would contradict the express provisions of that agreement . . . . This court cannot speculate as to what [the agreement] contain[s] or how to construe the scope of any implied covenant to market that may exist." *Id*. (citing *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993)).

Second, even ignoring Elliott's "strategic choice" not to rely on the express terms of the royalty agreement, the implied duty to market claim "still fail[ed]." *Id*. Elliott tried to use the implied duty to supplement the express provisions of the agreement, including the "at the well" language. *Id*. Doing so was improper, we said, because

- 13 -

"under New Mexico law, covenants are not implied for subjects that are treated in express provisions." *Id*. (citing *Cont'l Potash, Inc.*, 858 P.2d at 80). Moreover, the operators were actively marketing the gas and New Mexico law did not support the applicability of the marketable condition rule. *Id*. at 1113-14.

Our rejection of the marketable condition rule constituted an alternative rationale for rejecting Elliott's implied duty to market claim. "Alternative rationales, . . . providing as they do further grounds for the Court's disposition, ordinarily cannot be written off as *dicta*." *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008); *see also United States v. Rohde*, 159 F.3d 1298, 1302 (10th Cir. 1998) (alternative holdings are not dicta).

Admittedly, we could have resolved Elliott's implied duty to market claim without reaching the applicability of the marketable condition rule. However, we could have also decided the claim solely by rejecting the marketable condition rule. The New Mexico Trusts have not explained why we ought label the latter dicta, but not the former. *See Rohde*, 159 F.3d at 1302 n.5 (10th Cir. 1998) ("Were this panel inclined to engage in the business of labeling as *dicta* one of the two alternative grounds . . . , it would then confront defendant's failure to demonstrate why that label ought not adhere to the alternative which is innocuous to her theory, rather than to the alternative which undermines it.").

E. *Reliance on Continental Potash*

The New Mexico Trusts also attack *Elliott* for relying on *Continental Potash, Inc.*

- 14 -

*v. Freeport-McMoran, Inc.*, 858 P.2d 66 (N.M. 1993), which they say was subsequently limited by *Davis*, 218 P.3d 75.  For what it's worth, we agree with their reading of *Davis*; but it doesn't help them.

In *Continental Potash*, the New Mexico Supreme Court said covenants will not be implied on contracting parties when the issue is expressly covered in the parties' agreement.  858 P.2d at 80 ("The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter"; "when the contract between the parties speaks to the obligation sought to be implied, courts will not write that implied obligation into the contract.").  However, in *Davis*, the Court clarified that *Continental Potash* was speaking only to those covenants "implied in fact," i.e., those implied based on the language of the parties' agreements.  218 P.3d at 85.  Not surprisingly, covenants implied in fact require analyzing the parties' intentions as expressed in their agreement.  *Id*.  But, as *Davis* makes clear, there are also covenants implied as a matter of law.  *Id*.  Duties implied by law apply to the parties irrespective of the language of their agreement.  *Id*.  *Davis* said the implied duty to market falls in the latter category.  *Id*. at 86.  It thus undermines *Elliott*, but only in part.

The *Elliott* panel relied on *Continental Potash* as one basis for rejecting Elliott's implied duty to market claim—it could not determine whether an implied duty to market existed without knowing from the royalty agreement whether such duty was intended, nor could Elliott use the duty to supplement the royalty agreement's terms because covenants are not implied for subjects expressly treated in an agreement.  *Elliott*, 407 F.3d at 1113.

- 15 -

*Davis*, however, said the implied duty to market is one implied by law, which does not require analysis of the parties' agreement and applies notwithstanding that agreement.[12]

But *Davis* <u>does not</u> undermine *Elliott*'s decision that the marketable condition rule finds no support in New Mexico law because, semantics aside, the *Davis* Court explicitly declined to decide that issue, finding it not ripe for review. *Id.* at 80-81 ("[W]e do not

---

[12] Energen argues: "[*E*]*ven duties implied by law* in New Mexico cannot be used to overcome or negate an express term contained within a contract." (Appellee's Answer Br. at 21 (quotation marks omitted).) Therefore, as it would have it, even assuming the marketable condition rule applied in New Mexico and it was a duty implied by law, it could not be used to overcome the express terms of the royalty agreements, which it claims direct it to pay royalty on the value of the gas at the wellhead and thereby allow it to deduct its post-production costs. *See Creson v. Amoco Prod. Co.*, 10 P.3d 853, 857-59 (N.M. Ct. App. 2000) (agreement calling for payment of royalties based on the "net proceeds derived from the sale of . . . [g]as at the well" is unambiguous and means the royalties are to be paid "based on the value of the . . . gas as it emerges at the well head" and allows for deductions of post-production costs); *see also Abraham*, 685 F.3d at 1200 ("In order to determine the market value of the unprocessed gas at the well, producers sell refined natural gas . . . at the tailgate of the processing plant (i.e., after processing) to establish a base sales amount, and deduct from that amount costs for transportation, processing, etc. This is called a 'netback' or 'workback' method, and it is widely accepted as the best means for estimating the market value of gas at the well where no such market exists."). In support of this proposition, it cites *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1203 (N.M. 2008).

But *Sanders* involved the implied covenant of good faith and fair dealing. *Id.* Moreover, it relied, in part, on *Continental Potash*, before it was clarified by *Davis*. Energen also ignores *Davis*, which said the implied duty to market is one implied by law and therefore applies regardless of what the parties' contract says on the issue. 218 P.3d at 86. We therefore decline to resolve this issue based on the language of the parties' royalty agreements, even though (1) other jurisdictions which have adopted the marketable condition rule do not apply it if the royalty agreement says otherwise, *see infra* note 16, and (2) the New Mexico Trusts concede in their reply brief that they have never "argued . . . that the marketable condition rule, and the implied duty to market to which the marketable condition rule attaches, trumps express contractual language." (Appellants' Reply Br. at 3.)

- 16 -

address the existence of the marketable condition rule in New Mexico . . . . [N]othing in this opinion should be construed as either the recognition or disapproval of the marketable condition rule, its scope, or its applicability."). It assumed the marketable condition rule applied in New Mexico only because the trial judge concluded it did. *Id*. at 80. Even more to the point, the New Mexico Supreme Court subsequently clarified: "[I]n *Davis* we declined to address whether the marketable condition rule is inherent in the implied covenant to market, and whether, if recognized in New Mexico, the marketable condition rule would be implied in fact or at law." *ConocoPhillips Co. v. Lyons (Lyons)*, 299 P.3d 844, 860 (N.M. 2012) (citation omitted).

Notwithstanding that fairly clear statement, the New Mexico Trusts nevertheless tell us the *Davis* Court implicitly imposed the marketable condition rule on New Mexico. According to the Trusts, the *Davis* Court surely would have recognized the extreme waste of judicial resources that would occur for it to grant class certification in that appeal based on the trial judge's adoption of the marketable condition rule only to later say in a second appeal that the marketable condition rule does not exist in New Mexico, thereby requiring decertification. As they would have it, this shows the *Davis* Court intended to affirm the judge's adoption of the rule.

We reject the argument because it flies in the face of the Court's explicit statement that it was <u>not</u> deciding whether the marketable condition rule applied. 218 P.3d at 80. Indeed, subsection B is titled "WE DO NOT ADDRESS THE MARKETABLE

- 17 -

CONDITION RULE." *Id.* It doesn't get much clearer than that.[13]

F. *Reliance on Creson*

The New Mexico Trusts argue we should not follow *Elliott* because it relied on *Creson v. Amoco Prod. Co.*, 10 P.3d 853 (N.M. Ct. App. 2000). In doing so, they tell us, *Elliott* rejected the marketable condition rule because "this conception of the implied duty to market finds no support within New Mexico case law . . . because this duty imagined by the plaintiff is inconsistent with New Mexico law because the express terms of the *Elliott* royalty obligations direct the royalty to be paid on the value of the gas 'at the well.'" (Appellants' Op. Br. at 18 (alterations incorporated).) A careful reading of *Elliott* reveals this to be incorrect.

Elliott argued (1) the implied duty to market included the marketable condition rule and (2) the operators' fee for processing the gas "is a *production* cost that must be borne by [the operators] because there is no market for the unprocessed gas at the

---

[13] The New Mexico Trusts' reliance on our decision in *Abraham* doesn't help them. There, a class of royalty owners alleged, among other things, that BP breached the implied duty of good faith and fair dealing in underpaying royalties. 685 F.3d at 1201, 1204. The district judge refused to give a jury instruction on the claim. *Id.* at 1204. Without knowing why the judge refused the instruction, we could not review the decision. *Id.* at 1205. We also rejected BP's argument that this claim was foreclosed by *Elliott*: "The plaintiff in [*Elliott*] did not articulate the necessity of such a duty to effectuate the express provision. Additionally, subsequent pronouncements by the New Mexico courts may influence the analysis. *See Davis v. Devon Energy Corp.*, 147 N.M. 157, 218 P.3d 75 (2009); *Sanders v. FedEx Ground Package Sys., Inc.*, 144 N.M. 449, 188 P.3d 1200 (2008)." *Id.* The New Mexico Trusts seem to suggest that *Abraham* calls *Elliott*'s discussion of the marketable condition rule into doubt. But *Abraham* was only referring to *Elliott*'s discussion of the implied duty of good faith and fair dealing.

wellhead."[14] 407 F.3d at 1114 (emphasis added). As to the <u>first</u> argument, we said the marketable condition rule "finds no support within New Mexico case law." *Id.* With regard to the <u>second</u>, we decided the argument was "inconsistent with New Mexico law because the express terms of the royalty obligations direct the royalty to be paid on the value of the gas 'at the well.'"[15] *Id.* We cited *Creson* only for the latter proposition. *Id.* *Creson* had nothing to do with our rejection of the marketable condition rule in New Mexico.

The New Mexico Trusts also say *Creson* is factually dissimilar because, unlike in this case, the parties in *Creson* stipulated that the gas was marketable at the wellhead. 10 P.3d at 856. We repeat: *Elliott* did not rely on *Creson* in rejecting the marketable condition rule in New Mexico. *Creson* <u>did not address the marketable condition rule</u>.

G. *Sister States and New Mexico District Courts*

The Trusts also tell us that since *Elliott* was decided in May 2005, several New Mexico district courts have recognized the marketable condition rule as part of the implied duty to market and none has ruled otherwise. *See Davis*, 218 P.3d at 79-80 (collecting cases). The Trusts also point us to other states, including Colorado,

---

[14] Elliott tried to classify the processing fee in that case as a "production" cost, rather than a "post-production" cost, because production costs (the costs associated with bringing the gas forth from the earth) must generally be borne by the well operator. *Lyons*, 299 P.3d at 853.

[15] It was inconsistent with New Mexico law because the operators' fee for processing the gas was a <u>post-production cost</u> (as in this case), which is deductible from the sales price of the processed gas to arrive at the "market value of the gas at the well." *See supra* note 12.

Oklahoma, and West Virginia, which have adopted the marketable condition rule. That is an overstatement. Colorado, for example, applies it only when the parties' agreement is silent on the matter.[16] They also rely on a footnote in *Anderson Living Trust v. WPX Energy Production, LLC*, in which Federal District Judge James O. Browning criticized *Elliott* and stated his belief that "if and when the Supreme Court of New Mexico determines that the existence of the marketable condition rule is ripe for review, it will find that the rule is included in oil-and-gas contracts as part of the implied duty to market." 27 F. Supp. 3d 1188, 1225 n.12 (D.N.M. 2014).

We are not bound by these decisions. However, we are bound by *Elliott*, absent an intervening decision by the New Mexico Supreme Court or a state statute addressing the issue. *Wankier*, 353 F.3d at 866. There has been no subsequent decision or statute. Not only that, since *Elliott* was decided over twelve years ago, the New Mexico Supreme Court, although given the opportunity to do so, has not expanded the implied duty to market to include the marketable condition rule with respect to private oil and gas leases. *See Lyons*, 299 P.3d at 860; *Davis*, 218 P.3d at 80-81; *Ideal v. Burlington Res. Oil & Gas*

---

[16] *See Garman*, 886 P.2d at 653-54, 659-60 (Colo. 1994) (en banc) (when a royalty agreement is silent with respect to allocation of post-production costs, the implied duty to market prohibits the lessee from deducting those costs from the royalty payment); *see also Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882-83 (Okla. 1992) ("We interpret the lessee's duty to market to include the cost of preparing the gas for market . . . . If a lessee wants royalty owners to share in compression costs, that can be spelled-out in the oil and gas lease."); *Wellman v. Energy Res., Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001) ("[I]f an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.").

*Co. LP*, 233 P.3d 362, 365 (N.M. 2010).

H. *Certify*

The Trusts ask that we certify this issue to the New Mexico Supreme Court.[17] "When state law permits, [we] may . . . certify a question arising under state law to that state's highest court according to that court's rules." 10th Cir. R. 27.2(A)(1). New Mexico law permits the New Mexico Supreme Court to "answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state." N.M. Sat. Ann. § 39-7-4. The issue concerning the applicability of the marketable condition rule satisfies these criteria, but that does not end the debate.

Whether to certify is ultimately left to our discretion. *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974); *see also Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) ("Whether to certify a question of state law to the state supreme court is within the discretion of the federal court."). While certification saves "time, energy, and resources and helps build a cooperative judicial federalism," *Lehman Bros.*, 416 U.S. at 391, it "is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." *Armijo*, 843 F.2d at 407; *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 178 F.3d 1363, 1365 (10th Cir. 1999) ("Certification is never

---

[17] The Trusts also sought certification in the district court. The judge denied their request, relying on *Elliott*.

compelled, even when there is no state law governing an issue."). We have a "duty to decide questions of state law even if difficult or uncertain." *Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998). "[W]e will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves."[18] *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007).

We decline to certify in this case. *Elliott* decided the issue for this Circuit. Over twelve years have passed since then and the New Mexico Supreme Court has not included the marketable condition rule in the implied duty to market, despite having the opportunity to do so in *Davis* and *Ideal*. And *Lyons* specifically declined to apply the marketable condition rule to state leases where the statutory language contained in the leases required royalty to be paid on the "net proceeds derived from the sale of such gas in the field," which the Court interpreted to allow the lessee to deduct its post-production costs. 299 P.3d at 848, 850, 859-60. Moreover, the New Mexico legislature has not addressed the issue. None of the arguments the New Mexico Trusts have provided for not following *Elliott* are persuasive. While New Mexico law certainly implies a duty on oil and gas well operators to diligently market the product for the benefit of the royalty

---

[18] The New Mexico Trusts also suggest we should certify this issue because the only reason they are in federal court is due to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). They claim "[t]hey should not be penalized because they are in federal court." (Appellants' Op. Br. at 12.) But, following their logic, we could never deny certification in a case where federal jurisdiction derives from § 1332, including diversity jurisdiction. "Such a rule would be clearly wrong." *See Copier ex rel. Lindsey*, 138 F.3d at 839.

owners, *see Darr*, 346 P.2d at 1044, we continue to find no indication the New Mexico

Supreme Court would expand that duty to include the marketable condition rule, in

particular where, as in this case, the language of the royalty provision allows for the

deduction of post-production expenses. *See supra* note 12 (citing *Creson*, 10 P.3d at 856-

60, and *Abraham*, 685 F.3d at 1200 (10th Cir. 2012)); *see also Lyons*, 299 P.3d at 848,

850, 859-60.

I. *Conclusion*

The district judge properly dismissed the New Mexico Trusts' implied duty to

market claim as it was based on the marketable condition rule, which does not exist in

New Mexico.

## II. New Mexico Gas Processors Tax Act – New Mexico Trusts

The State of New Mexico imposes a privilege tax, known as the "natural gas

processors tax," on the third-party companies who process the gas for Energen.  N.M.

Stat. Ann. § 7-33-4(A).  The third-party companies pay the tax to the State but, pursuant

to their contracts with Energen, require Energen to reimburse them for their tax

payments.  Energen in turn passes a proportionate share of this tax to the New Mexico

Trusts by deducting it from their royalty payment.[19]

---

[19] Energen also occasionally deducted the tax from the Tatum Trust's monthly royalty payment even though its interest lies in wells in Colorado.  However, it appears the Tatum Trust was only assessed that tax when the gas from its wells was treated in a processing plant located in New Mexico.  The opening brief is unclear whether the Tatum Trust is challenging the tax or simply the New Mexico Trusts.  We need not resolve the ambiguity because the answer to the narrow issue raised is the same irrespective of the

(Continued . . .)

The New Mexico Trusts think this deduction to be improper. Their argument is narrow. Relying on a 1998 amendment to the statute (effective January 1, 1999), they claim Energen cannot deduct the natural gas processors tax from their royalty payments because they are not processors.

Prior to 1998, § 7-33-4 provided:

A. There is levied and shall be collected by the oil and gas accounting division of the taxation and revenue department, a *privilege tax on processors* for the privilege of engaging in the business of processing based on the value of their products. The measure of the tax shall be forty-five one-hundredths of one percent of the value of the products.

. . . .

C. *Every interest owner is liable for this tax to the extent of his interest* in the value of such products or to the extent of his interest as may be measured by the value of such products.

*Blackwood & Nichols Co. v. N.M. Taxation & Revenue Dep't*, 964 P.2d 137, 139 (N.M. Ct. App. 1998) (quotation marks omitted) (emphasis added).

In 1998 (effective January 1, 1999), the New Mexico legislature amended the Act. Section 7-33-4(A) now reads:

There is levied and shall be collected by the department a privilege tax on processors for the privilege of operating a natural gas processing plant in New Mexico. This tax may be referred to as the "natural gas processors tax".

The legislature eliminated the language making interest owners liable for the tax (subsection C above). It also defined "processor" as "a person who operates a natural gas

_____

named appellant—nothing in the New Mexico Gas Processors Tax Act or New Mexico law prohibits a processor from passing its tax burden on to others.

- 24 -

processing plant." *See id*. § 7-33-2(I).

We agree with the New Mexico Trusts that the amendment "shift[ed] the responsibility for paying the [tax] from interest owners to processors." *See Amoco Prod. Co. v. N.M. Taxation & Revenue Dep't*, 74 P.3d 96, 98 (N.M. Ct. App. 2003); *see also Blackwood & Nichols Co.*, 964 P.2d at 141 ("The 1998 legislative amendment of Section 7–33–4 clearly evinces a legislative intent to delete the requirement subjecting all 'interest owners' to liability for such tax . . . . The fact that the Legislature substantially rewrote the provisions of Section 7–33–4 indicates that the change was intended to modify the basis upon which the tax was previously levied. The change does not clarify existing law, instead it materially changes the tax basis.").[20] But that begs the real question presented here. It is not who is responsible for paying the tax to the State—the third-party processing companies are responsible for paying it and they, in fact, do. Rather, it is whether third-party processors can pass on all or part of that tax to the well operator and, in turn, whether the operator can pass it on to the royalty interest owners.

The Supreme Court's decision in *Exxon Corp. v. Eagerton* is instructive. 462 U.S.

_____

[20] The judge suggested the reason for the amendment:

In the context of the oil and gas industry, it is much more efficient for the state to collect the tax from a handful of processors than from numerous royalty and/or working interest owners. Instead of keeping track of all these owners and their respective ownership interests, the state need only look to the processor.

(Appellants' App'x at 1143.)

- 25 -

176 (1983).[21] The State of Alabama imposes a severance tax on oil and gas extracted from wells in the state. *Id*. at 178. Prior to 1979, the tax was imposed on the royalty owners in proportion to their interests in the oil and gas produced. *Id*. at 179. In 1979, the Alabama legislature increased the severance tax owed by well producers and specifically exempted royalty owners from the tax increase (royalty-owner exemption): "'Any person who is a royalty owner shall be exempt from the payment of any increase in taxes herein levied and shall not be liable therefor.'" *Id*. (quoting Ala. Code § 40–20–2(d) (1979)). It also prohibited the well operators from passing the tax increase, either directly or indirectly, on to their consumers. *Id*.

The well operators claimed the royalty-owner exemption violated the Contracts Clause of the United States Constitution because it impaired their contracts with the

---

[21] Interpreting the statute as the Trusts would have us do might create constitutional concerns, which should be avoided when possible. *Cf. Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1249 (10th Cir. 2008) (the canon of constitutional avoidance provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (quotation marks omitted)); *see also Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quotation marks omitted)). As we will explain (see discussion of the New Mexico Trusts' fuel gas claims), Energen's leases with those Trusts allow it to deduct post-production costs from the royalty owed, as it has lawfully done for years. The natural gas processors tax is a post-production cost. Reading the statute to prohibit Energen from shifting the burden of the tax to the Trusts might well impair its existing contracts with the Trusts in violation of the Contracts Clause. *See* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."). These leases are 70 to 90 years old and will continue as long as the wells are producing.

royalty owners, which required the owners to reimburse them for the severance tax. *Id*. at 187-88 & n.9. The Supreme Court concluded the royalty-owner exemption did not nullify the operators' contractual obligations:

> On its face [the exemption] *provides only that the legal incidence of the tax increase does not fall on royalty owners, i.e., the State cannot look to them for payment of the additional taxes*. In contrast to [the prohibition on passing the tax increase through to consumers], *the royalty-owner exemption nowhere states that [operators] may not shift the burden of the tax increase in whole or in part to royalty owners*.

*Id*. at 188-89 (emphasis added). Intended or not, its interpretation of the statute avoided a constitutional problem. *See supra* note 21.

Similarly, nothing in the 1998 amendment to § 7-33-4(A) prohibits the processors from passing the tax onto Energen or from Energen passing the tax onto the New Mexico Trusts. The amendment simply prohibits the State of New Mexico from seeking payment from the Trusts.

As a final matter, the Trusts rely on *Amoco Prod. Co.* and *Blackwood & Nichols Co*. But those cases are not helpful. While they interpreted the amendment to § 7-33-4 as shifting the responsibility for paying the tax from royalty owners to processors, neither case addressed whether the processors/operators can properly shift the burden of the tax onto the royalty owners via contract.

The summary judgment on this claim was proper.

### III. Gas Used as Fuel—New Mexico Trusts and Tatum Lease

This issue requires us to meld statutory and case law with various provisions in an oil and gas lease. Those provisions include the royalty provision, which dictates how

- 27 -

much the lessee owes the owner of the mineral rights for the right to extract and sell oil and gas from the land, and the "free use" clause, which governs the right of a lessee to use oil and gas (fuel gas) from the leased properties in its operations. Our task is to interpret these provisions and harmonize them to give effect to the intent of the parties.

Pursuant to its contracts with the third-party processing companies, Energen pays these companies, in part, with gas produced from wells on the leased properties to fuel their operations (in-kind compensation). Energen does not pay royalty on the gas so used to either the New Mexico Trusts or the Tatum Trust.

The Trusts object, claiming they are entitled to royalties on the gas used as fuel (fuel gas). Because the resolution of this issue depends in large part on the applicable lease agreements, we address each Trust separately but discuss the Anderson and Pritchett Trusts together because their interests are subject to one lease.

A. *Anderson and Pritchett Trusts*

The royalty provision in the Anderson and Pritchett Trusts' lease provides in relevant part:

> [T]he lessee shall monthly pay lessor as royalty on gas marketed from each well <u>where gas only is found</u>, one-eighth (1/8) of the proceeds if sold at the well; or if marketed by lessee off the leased premises, <u>then one-eighth (1/8) of its market value at the well</u>. The lessee shall pay the lessor (a) one-eighth (1/8) of the proceeds received by the lessee <u>from the sale of casinghead gas, produced from any oil well</u>; (b) one-eighth (1/8) of the value, at the mouth of the well, computed at the prevailing market price, of the casinghead gas produced from any oil well and used by lessee off the leased premises for any purpose or used on the lease premises by the lessee for purposes other than development and operation thereof . . . .

(Appellants' App'x at 338 (emphasis added).)

- 28 -

The lease also contains a "free use" clause: "The lessee shall have the right to use free of cost, gas, oil and water found on said land for its operations thereon, except water from the wells of the lessor." (*Id.*) "A free use clause is an express provision that appears in most oil and gas leases and governs the right of a lessee to use products derived from the leased properties in the operation of said lease." *Lyons*, 299 P.3d at 855 (citing 3 Williams & Meyers, § 644.5 at 573-574.1). "When a royalty clause provides that the lessee is privileged to use gas in operating the lease, it is generally held that the gas used for these purposes should be excluded in the calculation of the lessor's royalty. However, a lessee's right to use gas in the operations of the leased premises is not without limits and *is generally interpreted as being limited to the leased premises unless the clause expressly states otherwise*."[22] *Id.* at 856 (emphasis added) (citing 2 W.L. Summers, *The Law of Oil and Gas*, § 33:12, at 160 (3d ed. 2008), and 3 Williams & Meyers, § 661.4, at 763).

The Trusts claim the express terms of the royalty provision require royalty to be paid on <u>all</u> gas produced, particularly that used off the leased premises for any purpose. They further claim the "free use" clause limits Energen's free use of gas to that occurring on the leased premises. According to them, because the third-party companies' use of the gas occurs off the leased premises, the clause is inapplicable and they are entitled to

_____

[22] A "free use" clause may also dictate a <u>lessor</u>'s right to the free use of gas for domestic purposes. *See* 3A W.L. Summers, *The Law of Oil and Gas*, § 30:4 (3d ed. 2008).

royalty on that gas.

The argument is problematic. The royalty language consists of two disparate parts. The first relates to "gas only" wells and requires royalty to be paid on "gas marketed from each well" and provides for a royalty of 1/8 of the market value at the wellhead when, as here, the gas is marketed off the leased premises. The provision relating to "casinghead gas" (gas produced from an oil well) is remarkably different and more specific—a royalty payment is due for "casinghead gas produced from any oil well and used by lessee off the leased premises for any purpose or used on the lease premises by the lessee for purposes other than development and operation thereof." (Appellants' App'x at 338.) The record does not clearly reveal whether the wells at issue are gas only or oil wells producing "casinghead gas." The parties and the judge seem to have assumed the gas at issue was produced from gas only wells.

In their arguments to us, the Trusts rely on the "casinghead gas" royalty provisions, but by our reckoning they have never claimed or provided any evidence that the gas used as fuel in this case is "casinghead gas." Accordingly, we look to the royalty provision relating to gas only wells.

That royalty provision requires royalty to be paid only on "gas marketed from each well" (sold gas) and royalty is owed on the market value of the gas at the wellhead if, as here, it is marketed off the leased premises. As we have already explained (*see supra* at 8-10 and note 12), this allows Energen to deduct its post-production costs, including the fuel gas (which is an in-kind post-production cost), from the sales price of

the gas to arrive at that value. Although the marketable condition rule would perhaps produce a different result, the New Mexico Supreme Court has not adopted that rule and we see no indication that it will or, if it does, it will apply the rule when the royalty provision requires royalty to be paid on the market value of the gas at the well, which allows for deduction of post-production costs from the downstream sales price to arrive at that value. Moreover, the fact the lease expressly imposes a royalty on casinghead gas "used off the leased premises for any purpose" strongly suggests royalty payments are not expected on the production from gas only wells, which contain no such restriction.

The "free use" clause supports this conclusion. Since nothing else in the lease suggests otherwise, the "free use" clause is only self-limiting. The Trusts seem to agree, as their arguments focus only on the applicability of *Lyons* in assessing the <u>scope</u> of the "free use" clause.

In arguing the "free use" clause obviates any requirement for it to make the royalty payment the Trusts seek, Energen relies on *Lyons.* In it, the New Mexico Supreme Court analyzed a "free use" clause in a <u>state lease</u> which granted the lessees "the right . . . to the free use of oil [and] gas . . . *from* said lands" "for the sole and only purpose of exploration, development and production of oil and/or gas *thereon* and *therefrom* with the right to own all oil and gas so produced and saved therefrom and not reserved as royalty by the lessor . . . ." 299 P.3d at 855 (quotation marks omitted). The New Mexico Supreme Court concluded this language gave the lessee the right "to the free use of oil and gas produced *from* the leased premises, *regardless of where the use occurred*, so long

- 31 -

as the oil and gas was being used to further the economical operations of said land." *Id.* at 856 (first emphasis in original, second emphasis added). Because the gas used by the post-production service providers in *Lyons* was for the development and production of the leased premises, it was not subject to royalty. *Id.*

The Trusts tell us *Lyons* does not control because it explicitly said its decision does not apply to private leases, only state leases. However, while the Court said "[*t*]*his opinion* should not be interpreted as affecting private oil and gas leases agreements," *id.* at 860 (emphasis added), it did so in its discussion of the marketable condition rule. *Id.* at 860. It did not limit its analysis of the "free use" clause to state leases.

The Trusts also argue *Lyons* is distinguishable because the "free use" clause in that case required the gas to be "*from* said lands" for the exploration, development, and production of oil and gas "*thereon* and *therefrom*." They claim these terms imply a use away from the leased premises. In contrast, the "free use" clause found in their lease uses only the term "thereon," which they claim implies the use will occur on the leased premises.

"Thereon" means "on that." *See* https://www.merriam-webster.com/dictionary/thereon; *see also* Black's Law Dictionary (10th ed. 2014) (defining "thereon" as "[o]n that or them"). Applying this plain meaning to the "free use" clause in the Anderson and Pritchett Trusts' lease, it seems the clause requires that the use of gas "found on said land" be for operations "on that" land. But in *Lyons*, the Court relied on *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496 (N.D. 2009), a decision from

the Supreme Court of North Dakota, which interpreted a nearly identical "free use" clause to simply require that the use of the gas be in furtherance of the lease operations, regardless of where that use occurs.

In *Bice*, Petro-Hunt sent casinghead gas to one of its three central tank batteries, where the gas was separated from the oil and water. 768 N.W.2d at 503. The oil, gas, and water were then transported in separate streams to the processing plant where the gas was made marketable. *Id.* Petro-Hunt took processed gas from the plant and used it to fuel its central tank batteries. *Id.* Some of the leases in that case contained "free use" clauses giving Petro-Hunt "'the right to use, free of cost, gas, oil and water produced on said land for its operation *thereon*.'" *Id.* (emphasis added). The royalty interest owners, like the Anderson and Pritchett Trusts, argued Petro-Hunt owed them royalty on the gas used as fuel. *Id.* They claimed the "free use" clauses' use of the phrase "operations thereon" limited Petro-Hunt's free use of gas to that occurring on the leased premises. *Id.* The central tank batteries were located off the leased premises. *Id.*

The North Dakota Supreme Court disagreed:

> The record indicates the functions performed by the central tank batteries are the same functions normally performed at individual well sites. Instead of having a battery at each well site, Petro–Hunt consolidated these facilities into three central tank batteries. The record demonstrates the use of the central tank batteries benefits both Petro–Hunt and the [royalty interest owners]. The central tank batteries are beneficial to both . . . because they are more efficient resulting in less overall use of lease gas, minimize surface disturbance and allow hydrocarbons to be recovered from gas on which the lessors receive royalties.

> Interpreting the "free use" clause to only allow Petro–Hunt to use residue gas on the leased premises could lead to an absurd result because it would require lessors who have a central tank battery on their property to bear the entire burden

- 33 -

of the "free use" clause, notwithstanding benefits conferred on the other lessors. The record demonstrates the residue gas is used in furtherance of overall lease operations because it is used to fuel equipment which separates the oil, gas and water into separate streams, thereby allowing the [the processing plant] to process the gas into a marketable product and to recover other products sold at the plant tailgate. *Since the residue gas is used in furtherance of the leased operations, we conclude the district court did not err in determining the "free use" clause allowed Petro–Hunt to use the residue gas off of the leased premises to fuel the central tank batteries.*

*Id*. at 503-04 (emphasis added).

By favorably citing *Bice*, the New Mexico Supreme Court seems to have suggested that if confronted with a "free use" clause similar to that in the Anderson and Pritchett Trusts' lease it would rule the same way. Thus, the phrase "operations thereon" in the Anderson and Pritchett Trusts' "free use" clause is not a limitation on where the use of the gas may occur but rather a limitation on the purposes for which the gas may be used—furtherance of the lease operations. That is an expansive provision, easily satisfied in this case. Gas is provided to third-party processors as partial payment for the services they render in making the gas marketable (and the Trusts' royalty payments are only reduced by their pro-rata share of the expense). That furthers the lease operations. Without it, there would be no viable market for the product. The Trusts do not contend otherwise. Instead, they attempt to distinguish *Bice*.

They claim the reason *Bice* held the "free use" clauses allowed Petro-Hunt to use gas free of cost to fuel its central tank batteries off the leased premises is because the functions performed by those tank batteries were those normally performed on the leased premises. They say the operations performed in this case by the third-party processors

- 34 -

are not normally performed on the leased premises.

We do not read *Bice* so narrowly. As the court noted, the central tank batteries performed functions normally performed at individual well sites. 768 N.W.2d at 503. However, it did so to emphasize that to interpret the "free use" clauses to only allow Petro-Hunt to use the gas free of cost on the leased premises would lead to an "absurd result"—it would require the royalty owners with a central tank battery on their property to bear the entire burden of the "free use" clause, notwithstanding the benefits conferred by the central tank battery on the other royalty owners. *Id*. at 504. Nevertheless, the Court also explicitly held: "*Since the residue gas is used in furtherance of the leased operations, we conclude the district court did not err in determining the 'free use' clause allowed Petro–Hunt to use the residue gas off of the leased premises to fuel the central tank batteries*." *Id*. (emphasis added).

The Trusts also cite an oil and gas treatise, which in turn cites an Oklahoma case, *Vogel v. Cobb*, 141 P.2d 276 (Okla. 1943). In *Vogel*, the Oklahoma Supreme Court interpreted a clause in an oil and gas lease entitling the lessee to the free use of "'water produced on said land for its operation thereon.'" *Id*. at 279. It said the clause did not give the lessee the right to use water from the land to supply houses located on other lands, even though the occupants of the houses were the lessee's employees. *Id*. *Vogel* is an Oklahoma case; we are concerned with New Mexico law. The New Mexico Supreme Court has interpreted similar language differently. The use of water from the leased premises to supply employee housing would, remotely, be a use in furtherance of the

lease operations. But saying so strains credulity beyond elastic limits and is therefore unlike the use of gas in this case.

Energen was entitled to summary judgment on the Anderson and Pritchett Trusts' fuel gas claim.

B. *N-R Trust*

The N-R Trust's overriding royalty agreement requires Energen to pay "at the prevailing field market price therefor at the time when produced a royalty in cash or oil amounting to seven and one half (7 ½) percentum of all oil and gas produced from the lands embraced in said primary lease . . . ."[23] (Appellants' App'x at 342 (emphasis added).) The Trust tells us the royalty provision requires Energen to pay royalty on all gas produced, including that used as fuel. True enough.

The royalty provision is explicit: royalty is owed on all oil and gas produced from the leased lands. In other words, royalty is to be paid on all gas emerging from the wellhead of each well within the area described in the lease. The royalty provision does not exclude gas used as fuel and, unlike the Anderson and Pritchett Trusts' lease, this lease does not contain a "free use" clause. Energen has been using fuel gas royalty free, as it could if the lease had a "free use" provision permitting it do so. Its practice is not

---

[23] The underlying lease agreement from which the N-R Trust's overriding royalty interest derives is a 1924 federal lease. The parties do not provide copies of that lease but we assume the quoted language from the N-R Trust's overriding royalty interest accurately repeats the language of the federal lease, which is, of course, controlling. Production costs cannot be deducted from the overriding royalty interest; post-production costs may, however, if payment is to be made on the value of the gas at the well.

only contrary to the royalty provision of the lease, it also impermissibly reads into the lease a "free use" clause that is not there.[24] *See Thompson v. Potter*, 268 P.3d 57, 62 (N.M. Ct. App. 2011) ("Our public policy is to give effect to the intention of the parties, and we do not rewrite parties' agreements."). But that is only half of the issue; the value of the fuel gas at the wellhead must be computed (as with the Anderson and Pritchett Trusts) using the netback method.

Although royalty is owed on all gas produced, it need be paid based "at the prevailing *field market price . . . at the time when produced*." The field market price at "the time when produced" is the value of the gas at the wellhead, where production occurs, when production occurs. In calculating that value, Energen may deduct the value of the fuel gas consumed as a post-production cost (along with other post-production costs), but it must also pay royalty on the wellhead value of the fuel gas consumed. Determining the wellhead value of the fuel gas consumed cannot be made on this record,

---

[24] The district judge concluded that even though the N-R Trust's lease did not contain a "free use" clause, New Mexico law allowing for the deduction of post-production costs to calculate the value of gas at the wellhead necessarily allowed Energen to the free use of fuel gas (because the fuel gas is an in-kind post-production cost that can be deducted to arrive at the value of the gas at the wellhead). He relied on language in *Lyons*, indicating that fuel gas is a post-production cost which is neither sold nor saved by the operator and therefore is not subject to royalty. But that statement from *Lyons* came in its discussion of a "free use" clause, *see* 299 P.3d at 856, something the N-R Trust's lease does not contain. Moreover, as we have explained, the N-R Trust's royalty provision requires royalty to be paid on all gas produced, not just gas that is marketed. And, while the fuel gas can be deducted as a post-production cost from the sales price of the processed gas (non-fuel gas) to arrive at that gas's value at the wellhead, Energen must also pay royalty on the fuel gas (at its value at the wellhead).

given the myriad variables involved. For instance, the district judge voiced at least part of the valuation problem—lost volume. No royalty is due, he said, on lost gas volume. *See* Appellants' App'x at 1139-40. Perhaps so[25]; we express no opinion. If correct, it underscores the need to determine the amount of fuel gas consumed, post-production, as well as its wellhead value. At the end of the day, the royalty owed on fuel gas may be small, but it must be determined. However, if the measurements necessary to compute the wellhead value of gas cannot be cost effectively made, reasonable estimates may suffice.

We have identified a unifying theme, not only here but for the Anderson and Pritchett Trusts' lease as well: royalties are to be calculated according to the lease terms and unless the lease provides otherwise the netback method should be used to determine the wellhead value of any gas at issue. We have every confidence that, aided by counsel, the district judge, who has demonstrated a comprehensive understanding of Oil and Gas Law, can find a way through the thicket.

The summary judgment entered in favor of Energen on the N-R Trust's fuel gas claim was improper. A remand is necessary for appropriate factual findings and required calculations.

C. *Tatum Trust*

---

[25] But compare the N-R Trust's royalty provision requiring royalty to be paid on all gas "produced" with the Anderson and Pritchett Trusts' lease, which requires royalty only on gas (from a gas well) "marketed" (sold). Does the former, but not the latter, require royalty to be paid on lost gas?

The Tatum Trust's royalty interests derive from two leases covering wells located in Colorado. The leases have "free use" clauses, but a "free use" clause may be limited by other lease provisions (*see supra* at 27-30). The Tatum Trust lease has exactly that kind of limitation: it provides the Trust "shall not bear, directly or indirectly, any production or post-production cost or expenses, including . . . cost or expenses for storing, separating, dehydrating, transporting, compressing, treating, gathering or otherwise rendering marketable or marketing the [gas], and no deduction or reduction shall be made for any such costs and expenses in computing any payment . . . to be made to Lessor." (Appellants' App'x at 390, 403.)

Energen seems to make "heads I win, tails you lose" arguments. For purposes of the New Mexico Trusts' fuel gas claims, it labels the fuel gas an in-kind post-production cost, which is deductible under the royalty provisions of those Trusts' agreements and New Mexico law (which does not apply the marketable condition rule). But it shies away from that label when discussing the Tatum Trust's fuel gas claim, most likely because Colorado prohibits oil and gas well operators like Energen from deducting from the royalty payment the costs necessary to render the gas marketable, unless the lease provides otherwise. *See Garman v. Conoco, Inc.*, 886 P.2d 652, 653-54, 659-60 (Colo. 1994) (en banc). These leases do not provide otherwise; in fact, they explicitly prohibit Energen from deducting post-production costs from the Trust's royalty. Energen cannot have it both ways—treating the fuel gas as an in-kind post-production cost when convenient but ignoring that treatment when it is not. In any event, as we now explain,

the "free use" clause does not help it.

"Free use" clauses are generally limited to the use of gas on the leased premises unless the clause expressly states otherwise. 3 Williams & Meyers, § 661.4 at 763. In this case, applying Colorado's rules of contract interpretation, the plain language of the "free use" clauses and the royalty provisions lead us to conclude the general rule applies—the use of the gas must occur on the leased premises to be free of royalty. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984) (in construing a contract, we look to the contract as a whole and seek "to ascertain and give effect to the mutual intent of the parties"; "[i]n the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning").

The "free use" clauses in the Tatum Trust's leases provide: "[Energen] shall have free use of oil, gas and water from said land . . . *for all operations hereunder.*" (Appellants' App'x at 392, 483 (emphasis added).) The plain meaning of "hereunder" is "under or in accordance with this writing or document" or "[a]s provided for under the terms of this document." *See* https://www.merriam-webster.com/dictionary/hereunder; https://en.oxforddictionaries.com/definition/hereunder; *see also* Black's Law Dictionary (10th ed. 2014) (defining "hereunder" as "[l]ater in this document" or "[i]n accordance with this document"). The term "hereunder" qualifies the phrase "all operations." So, to be free of royalties, the use of the gas must be for operations "under or in accordance" with the lease or "as provided for under the terms" of the lease.

- 40 -

Looking to the terms of the Tatum Trust's leases, the premises was leased "for the sole and only purpose of exploring, drilling, and operating for and producing oil and gas and of laying pipelines, storing oil and building tanks, telephone lines, roads and structures *thereon* to produce, save, care for, treat and transport said substances produced from the land leased hereunder." (Appellants' App'x at 403 (emphasis added).) As we read it, the purpose of the lease was to allow Energen to produce oil and gas <u>from the leased premises</u> and to store oil and build infrastructure <u>on the leased premises</u>. Thus, the operations called for by the lease are those occurring on the leased premises. As a result, the plain language of the "free use" clauses in these leases suggests only gas used on the leased premises is free of royalty. Fuel gas used off the leased premises is not a free use.

But even if the "free use" clauses do not supply a geographical limitation, the royalty provisions do. They differ from those appearing in the New Mexico Trusts' agreements. They provide:

> Lessee shall pay Lessor royalty . . . on all gas . . . produced from a well on the leased premises or on lands pooled with the leased premises and <u>sold or used</u> off the leased premises regardless of whether or not such [gas is] produced to the credit of Lessee or sold under a contract executed or binding on Lessee. Should [gas] be sold under a sales contract not binding on Lessor, Lessor's royalty shall be calculated by using the highest price paid for any of the [gas] produced from the well from which such [gas] was produced.

(Appellants' App'x at 403 (emphasis added).) As the Tatum Trust argues, these provisions require Energen to pay it royalty on gas (1) produced from a well on the leased

- 41 -

premises and (2) sold or used off the leased premises.[26]  Gas used as fuel by the third-party processing companies is "used off the leased premises."[27]  Under the express terms of the royalty provisions, royalty is owed to the Tatum Trust on this gas.

The district judge imposed limitations on the royalty provisions not supported by the express language of the leases.  First, he decided royalties were due only when Energen sells gas off the leased premises but the Trust receives no money for that sale.  But the provisions explicitly apply not only to the sale of gas off the leased premises but also to the <u>use</u> of gas off the leased land.  He further limited the royalty provisions to require royalty to be paid only on gas that is "produced" and (critically) concluded that fuel gas is not produced.  Apparently, he equated "produced" with "processed."  The leases do not define "produced."  However, while the gas at the wellhead, including the fuel gas, may not be processed, it is produced.  *See* 8 Williams & Meyers, at 830 (defining "[p]roduction of gas" as "[t]he act of bringing forth gas from the earth").  Indeed, even Energen labels the fuel gas as an in-kind <u>post-production</u> cost.

_____

[26] Energen argues the Tatum Trust waived any reliance on the royalty provisions because other than citing them, it does not otherwise provide any legal argument.  We agree the Trust's argument is less than eloquent.  However, the Trust does say "the express terms of the royalty language in the . . . Tatum leases . . . address whether royalty is due on the value of natural gas <u>used off the lease premises</u>" and then highlights the relevant portions of the leases.  (Appellants' Op. Br. at 26-27.)  It repeats this argument later in its brief: "The royalty language in the Tatum lease states that royalty is due for gas 'used off the lease premises.'"  (*Id*. at 34.)  We consider the argument sufficiently raised.

[27] Nothing in our discussion should be read to apply to the use of gas to fuel post-production processes occurring on the leased premises.

Relying on *Lyons* and *Bice*, Energen says the "free use" clauses should be interpreted to allow it to use gas free of cost so long as the use is in furtherance of the lease operations, irrespective of whether that use occurs on or off the leased premises.

*Lyons* controls as to the Anderson and Pritchett Trusts' fuel gas claim. But because the Tatum Trust's interests lie in wells located in Colorado, its law controls the fuel gas debate. The district judge concluded Colorado would decide the issue similar to the New Mexico Supreme Court largely because the Tatum Trust produced no cases holding otherwise. But the converse is also true; the judge cited no Colorado cases adopting the *Lyons* rationale and we can find none. We are left with applying generally accepted principles.

In addition to interpreting a "free use" clause containing the phrase "thereon," *Bice*, a North Dakota case, interpreted a "free use" clause giving the operator the right to "free use of oil, gas and water from said land . . . for *all its operations hereunder*." 768 N.W.2d at 503 (emphasis added). It concluded this clause allowed the operator to use the gas free of cost so long as the gas is used in furtherance of lease operations, regardless of where that use occurs. *Id*. The only reason we relied on *Bice* in resolving the New Mexico Trusts' fuel gas claim is because it was cited favorably in *Lyons*. No Colorado case has done so.

Energen also tells us our reading of the royalty provisions would nullify the "free use" clauses and argues the more specific "free use" clauses prevail over the broad language of the royalty provisions. But its arguments are based on there being a conflict

between the royalty provisions and the "free use" clauses. There is no conflict. The royalty provisions require royalty to be paid on gas produced from the leased premises and sold or used off the leased premises. The "free use" clauses, on the other hand, suggest Energen may use gas from the leased premises free of royalty only when the use of the gas occurs on the leased premise or, at the very least, when the use accords with the other provisions of the leases, including their royalty provisions.

At first blush it may appear our resolution of the Tatum Trust's fuel gas claim is inconsistent with that of the Anderson and Pritchett Trusts' fuel gas claim. Any "inconsistency," however, derives from the different state law and lease provisions applicable to each.

We reverse the summary judgment and remand the Tatum Trust's fuel gas claim to the district court for reconsideration.

## IV. New Mexico Oil and Gas Proceeds Payment Act—New Mexico Trusts

The New Mexico Oil and Gas Proceeds Payments Act requires a producer, like Energen, to pay royalty owners "not later than forty-five days after the end of the calendar month within which payment is received by payor for production . . . ." N.M. Stat. Ann. § 70-10-3. Energen did so, except it held royalty funds from a well in a suspense account from July 2007 to December 2012 until a title issue relating to that well was resolved in favor of the N-R Trust. It paid these funds to that Trust in February 2013.

The New Mexico Trusts agree Energen was entitled to hold these funds in

- 44 -

suspense while the title issue was resolved. *See id.* § 70-10-4(A) ("In instances where payments cannot be made within the time period provided in [§] 70-10-3 . . . , the payor shall create a suspense account on his books for such interest or may interplead the suspended funds into court."). However, they claim Energen failed to pay interest on these funds, as required by N.M. Stat. Ann. § 70-10-4 ("The person entitled to payment from the suspended funds shall be entitled to interest on the suspended funds from the date payment is due under Section [§] 70-10-3 . . . ."). *See First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 313 (N.M. 2015) (under N.M. Stat. Ann. § 70-10-4, royalty interest owners are entitled to interest on funds held in suspense).

The district judge did not address whether interest was owed, even though he recognized at the summary judgment hearing that "there is an issue on whether there should be interest [on the late payment made to the N-R Trust]." (Appellants' App'x at 1084.) Nevertheless, Energen claims the New Mexico Trusts failed to raise this issue in the district court. But they did.

In their complaint, the New Mexico Trusts alleged Energen had failed to timely pay them "in numerous instances" in violation of the Act. (Appellants' App'x at 258.) They sought payment of all amounts due, "together with interest at the statutory rate." (*Id*. at 259.) In response to Energen's motion for summary judgment, the New Mexico Trusts changed their tale, claiming Energen "occasionally pays royalty late," pointing to the February 23, 2013 royalty check. (*Id*. at 460.) However, they again claimed Energen "failed to pay [them] interest on these late payments." (*Id*. at 465.) And, at the summary

judgment hearing, they argued Energen "owe[s] interest" on the late payments. (*Id*. at 1084.) The New Mexico Trusts clearly raised the issue.

Energen also seeks to distinguish *First Baptist Church of Roswell*, which, it tells us, merely concluded that royalty owners could not contract away their right to receive statutory interest on royalties held in suspense under the Act. Energen says no such contract exists here. We agree that was the ultimate result of that case. 345 P.3d at 313-16. However, to get to that result, the New Mexico Supreme Court first interpreted N.M. Stat. Ann. § 70-10-4. It said:

> Subsection A requires that when proceeds cannot be paid on time, the funds shall be held in a suspense account or interpleaded into court. *Subsection B provides that interest owners shall be entitled to receive interest on suspended funds that they are legally entitled to receive. The language in the statute clearly reflects the Legislature's intent to mandate that interest owners who are legally entitled to proceeds, but who are not paid on time, shall receive interest on funds that are rightfully owed to them.*

*Id*. at 313 (citations omitted). The N-R Trust was entitled to interest on the suspended funds.

Finally, Energen claims the New Mexico Trusts provided no evidence that the N-R Trust was not paid interest on the funds. However, the Trusts provided documentation on how the amount of the funds was calculated. As we read it, nothing in that documentation indicates whether the amount the N-R Trust received included statutory interest. (Appellants' App'x at 468-81.) On remand, the issue deserves clear resolution.

The district judge erred in granting summary judgment to Energen on this claim.

## V. Conclusion

We **AFFIRM** the district court's dismissal and summary judgment orders with respect to the New Mexico Trusts' claims regarding the marketable condition rule and the New Mexico Natural Gas Processors Tax Act. We also **AFFIRM** the summary judgment order with respect to the Anderson and Pritchett Trusts' fuel gas claim. We **REVERSE** the summary judgment order with respect to the N-R Trust's and Tatum Trust's fuel gas claims and the N-R Trust's claim under the New Mexico Oil and Gas Proceeds Payments Act and **REMAND** those matters to the district court for a decision consistent with this opinion. We **DENY** the Trusts' motion to certify the marketable condition rule issue to the New Mexico Supreme Court. We will address Energen's motion to seal its supplemental appendix in a separate order.